786 F.2d 1546
 Angus C. CRAFT, Jr., Betty C. Craft, Judith C. Dreyer and
Michael R. Dreyer, Plaintiffs-Appellees,
v.
FLORIDA FEDERAL SAVINGS & LOAN ASSOCIATION, a federally
chartered stock savings and loan association,
Defendant-Appellant.
 No. 85-3497.
 United States Court of Appeals,
Eleventh Circuit.
 April 22, 1986.
 
 R. Donald Mastry, St. Petersburg, Fla., Bruce Cohen, Michael L. Seabolt, Arthur W. Leibold, Jr., Robert M. Clark, Washington, D.C., for defendant-appellant.
 Thomas C. MacDonald, Jr., John J. Van Voris, Raymond T. Elligett, Jr., Frank R. Jakes, Shackeford, Farrior, Stallings & Evans, Tampa, Fla., for plaintiffs-appellees.
 Rosalind C. Cohen, Jacob H. Stillman, Asst. Gen. Counsel, Daniel L. Goelzer, Gen. Counsel, Richard A. Levine, Atty., Washington, D.C., for amicus curiae.
 Appeal from the United States District Court for the Middle District of Florida.
 Before JOHNSON and ANDERSON, Circuit Judges, and DYER, Senior Circuit Judge.
 DYER, Senior Circuit Judge:
 
 
 1
 This is an interlocutory appeal from an order of the district court denying the motions of Florida Federal Savings and Loan Association (Florida Federal) to dismiss the plaintiffs' complaint and for a summary judgment. Plaintiffs Crafts and Dreyers (Crafts), subscribers to a stock offering by Florida Federal pursuant to a conversion from a mutual to stock association, sought rescission and money damages by reason of an increase in the size of the stock offering allegedly in violation of the Federal Home Loan Bank Board (Bank Board) regulations, and various federal and state securities laws. The primary thrust of the motion to dismiss and the motion for summary judgment was that the district court lacked subject matter jurisdiction because under the National Housing Act and the Home Owners Loan Act of 1933, as amended, a United States Court of Appeals has exclusive jurisdiction to review a final action of the Bank Board which approves, with or without conditions, or disapproves a plan of conversion.
 
 
 2
 The district court denied the motions on the ground that the approval of the increase in the size of the stock offering was not a final action by the Bank Board on the plan of conversion, but instead was a subsequent action which was in violation of the Bank Board's regulations and thus was not within the purview of the Review Statutes. We disagree and reverse.
 
 
 3
 On February 1, 1983 Florida Federal filed its amended application for conversion with the Bank Board for permission to convert from a mutual to a stock form of organization. An independent valuation of the aggregate pro forma market value of the association prepared by Kidder, Peabody & Co., Incorporated (Kidder) accompanied Florida Federal's filing. Kidder's appraisal of the maximum pro forma market value of the stock to be issued and sold by Florida Federal was $86.25 million. On April 18, 1983 Florida Federal filed a further amendment to its application for conversion. Kidder's appraisal at that time showed an increase in the pro forma market value to a range between $93.75 and $125 million based upon changes in the market prices of the stock of a comparison group of savings and loan associations during the intervening ten week period. Florida Federal sought Bank Board approval to include a provision in its proposed plan for the conversion that would permit it to seek Bank Board approval of an increase or decrease in the number of shares of stock to be issued and sold in the conversion process depending upon Kidder's final appraisal of the association's value immediately prior to the public offering.
 
 
 4
 On April 29, 1983 the Bank Board approved, with certain conditions, Florida Federal's application for conversion, which included a plan of conversion. The plan provided in pertinent part:
 
 
 5
 The total number of conversion stock to be issued and sold by the Converting Association upon the conversion will be initially determined by the Board of Directors prior to the commencement of the Subscription Offering. Such determination will be based upon an estimate of the aggregate fair market value of the Converting Association at that time provided that, with the approval of FSLIC, the Board of Directors of Florida Federal may elect to increase or decrease the number of shares to be offered in the Public Offering if such estimate of the aggregate fair market value of the conversion stock of Florida Federal is increased or decreased by the independent appraiser; ...
 
 
 6
 As a condition of its April 29, 1983 approval the Bank Board required that the capital stock to be sold by Florida Federal should be for not less than $93,800,000 nor more than $125,000,000, and that after the sale of all the shares of the capital stock to be sold, Florida Federal should submit a statement by its independent appraiser that to the best of its knowledge and judgment nothing had occurred which would cause it "to conclude that the sale price was not compatible with its estimate of the Association's total pro forma market value at the time of sale."
 
 
 7
 On May 2, 1983 Florida Federal circulated a proxy statement for a May 26, 1983 membership meeting to approve its plan of conversion. It commenced its Subscription Stock Offering to eligible members by means of a Subscription Offering Circular which included the price range and anticipated shares estimate derived from the Kidder appraisal considered by the Bank Board on April 29, 1983, i.e., an estimated sale of 6.25 million shares of stock at a uniform price to be set between $15 and $20 per share. The offering circular indicated that Florida Federal expected to sell approximately 937,000 shares in the Subscription Offering and intended to offer the remaining 5,300,000 shares to the public in an offering managed by Kidder which would commence immediately following approval of the plan of conversion by Florida Federal's membership. Investors in this Subscription Offering were required to submit an order form and tender payment at the rate of $20 per share prior to 5:00 p.m. on May 25, 1983 with the right to have their money refunded if the plan was not approved by Florida Federal's members at the May 26, 1983 meeting.
 
 
 8
 The Subscription Offering Circular had a caveat which provided in pertinent part:
 
 
 9
 The number of shares to be offered in the Public Offering may be increased or decreased, with the approval of the FSLIC, if the estimate of the aggregate fair market value of Florida Federal issued shortly prior to the commencement of the Subscription Offering is increased or decreased by Kidder, Peabody ... Persons subscribing for less than 5% of the Conversion Stock would not have the right to increase their subscriptions in the event the total number of shares of Conversion Stock is increased. Since the percentage of the total Conversion Stock subscribed to by such persons would be reduced in such event, such an increase may be viewed as a disadvantage to such persons.
 
 
 10
 This provision in the Subscription Offering was in conformity with the Bank Board's regulation which required that the plan of conversion shall:
 
 
 11
 Provide that the converting insured institution shall issue and sell its Capital Stock at a total price equal to the estimated pro forma market value of such stock in the converted insured institution, based on an independent valuation, as provided in Section 563b.7.
 
 
 12
 12 C.F.R. Section 563b.3(c)(1) (1983).
 
 
 13
 The Crafts, depositors in Florida Federal, received the subscription offering materials on May 10, 1983 and exercised their right by purchasing 18,386 shares. This amounted to less than three tenths of one percent of the estimated number of shares to be offered in the conversion and less than two tenths of one percent of the total shares actually sold in the conversion.
 
 
 14
 In accordance with the plan of conversion and the Bank Board's regulations, Sections 563b.7 and 563b.3(c)(1), one of the conditions imposed in the Bank Board's approval of the application for conversion of April 29, 1983, required that:
 
 
 15
 (3) Promptly after the completion of the sale of all of the shares of Capital Stock to be sold in connection with the conversion, the Association shall submit ... (c) a statement by its independent appraiser that to the best of his knowledge and judgment nothing of a material nature has occurred (taking into account all of the relevant factors including those which would be involved in a change in the maximum subscription price) which would cause him to conclude that the sale price was not compatible with its estimate of the Association's total pro forma market value at the time of sale.
 
 
 16
 As the time for its final appraisal approached, Kidder informed Florida Federal that the market conditions might result in a still higher appraisal of the pro forma value of the Association and submitted a further independent appraisal. Based on this, and in accordance with its approved application for conversion of April 29, 1983, Florida Federal requested that the Bank Board grant it permission to issue and sell additional shares of stock in the converting Association without delaying the Public Offering or requiring recirculation of additional subscription offering materials to eligible subscribers and reopening the priority Subscription Offering.
 
 
 17
 On May 26, 1983, after the expiration of the subscription rights, Florida Federal submitted an updated appraisal prepared by Kidder to the Bank Board. This appraisal increased the estimated fair market value of Florida Federal from 125 million to 187.1 million. After evaluating this final appraisal, the Bank Board on May 26, 1983 took the following action:
 
 
 18
 ... the post-approved amendment of Florida Federal Savings and Loan Association, St. Petersburg, Florida ("Florida Federal") to its application for conversion from mutual to stock form is approved, and Florida Federal is authorized to sell the stock offered in connection with the conversion for a revised aggregate price of not less than 138,295,000 nor more than 187,195,000.
 
 
 19
 The Bank Board did not require a resolicitation of eligible subscribers and declared Florida Federal's final offering materials effective. The membership approved the plan of conversion at a meeting held the same day, May 26, 1983.
 
 
 20
 The Bank Board's approval and authorization to sell the stock at the revised aggregate price resulted in the sale of a total of 9,350,000 shares of conversion stock in the subscription and public offering at $20 per share.
 
 
 21
 The Crafts learned of the share increase almost immediately. On May 26 or 27, 1983, one of the Crafts purchased an additional 1000 shares of Florida Federal stock in the public offering. The stock traded at above $20 per share for about two weeks and then fell below the offering price. On July 8, 1983 the Crafts demanded that Florida Federal rescind their purchase of the conversion stock.
 
 
 22
 The Crafts contended that the updated appraisal of May 26, 1983 was arbitrarily contrived by Kidder to justify the share increase, that Florida Federal's failure to disclose the share increase represented a material omission from the subscription offering circular, and that under the Bank Board's regulations Florida Federal was required to sticker its offering circular to disclose the re-appraisal and share increase, recirculate its offering circular and tender rescission to investors in the subscription offering. The Crafts' amended complaint alleged that Florida Federal violated Section 12(2) and Section 17(b) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereon, Section 517.301 of the Florida Blue Sky Laws and Section 563b.3(h), Section 653b.7(k)(4) and (5) of the Bank Board regulations. Jurisdiction in the district court was said to be founded upon Section 27 of the Exchange Act, Section 22 of the Securities Act, 28 U.S.C. Section 1337, and the principles of pendent jurisdiction. Crafts sought rescission, injunctive relief and money damages.
 
 
 23
 Florida Federal moved to dismiss the amended complaint under Rule 12(b)(1), Fed.R.Civ.P. on the ground that the district court lacked subject matter jurisdiction by reason of the judicial review provisions contained in Section 402(j)(2) of the National Housing Act of 1934, 12 U.S.C. Section 1725(j)(2) and Section 5(i)(4) of the Home Owners Loan Act of 1933 as amended, 12 U.S.C. Section 1464(i)(4) (The "Review Statutes"). These Review Statutes provide:
 
 
 24
 Any aggrieved person may obtain review of a final action of the Federal Home Loan Bank Board or the Corporation which approves, with or without conditions, or disapproves a plan of conversion pursuant to this subsection only by complying with the provisions of subsection (k) of section 1730a of this title within the time limit and in the manner therein prescribed, which provisions shall apply in all respects as if such action were an order the review of which is therein provided for, except that such time limit shall commence upon publication of notice of such final action in the Federal Register or upon the giving of such general notice of such final action as is required or approved under regulations of the Corporation, whichever is later.
 
 
 25
 The provisions of Section 408(k) of the National Housing Act that apply to judicial review of Bank Board actions regarding conversions are those providing for exclusive judicial review in the United States Court of Appeals of Bank Board orders concerning savings and loan holding company activities. 12 U.S.C. Section 1730a(k) (1982). The Review Statutes provide that an aggrieved party may obtain review of a final action of the Bank Board approving a plan of conversion only by appealing to a United States Court of Appeals within thirty days of publication of notice of such final action in the Federal Register. In sum, the Court of Appeals is vested with exclusive jurisdiction whenever a party challenges a final action of the Bank Board which approves a plan of conversion. Notice of the Bank Board's April 29, 1983 action was published in the Federal Register on July 15, 1983. The Crafts filed their complaint in the district court on August 26, 1983.
 
 
 26
 The Crafts argue that the plan of conversion is a thirteen page document which outlines the procedures to be followed in the conversion process, and that it is not a euphemism for the entire conversion process. This being so, since the plan of conversion approved on April 29, 1983 did not authorize a material share increase without a tender of rescission, and did not approve the contents of Kidder's May 26, 1983 updated appraisal report used to justify the increase in the number of shares to be sold, the amended complaint does not attack the contents of the plan. Rather the Crafts' attack is centered on the subsequent increase, with the Bank Board's approval of the number of shares issued and sold in the course of the conversion without resolicitation of subscribers.
 
 
 27
 Florida Federal argues that a plan of conversion is a procedure for converting a mutual to a stock association which is described in the Bank Board's regulations. It points out that it is the application for conversion that is approved by the Bank Board, not just a selected exhibit (plan of conversion) therefrom. The Bank Board reviews the entire application which not only includes a plan of conversion, but proxy statements, offering circulars for the subscription and public offerings, notices to be used, form of proxy, the financial condition of the association, appraisal materials, and all other materials furnished in compliance with the Bank Board's regulations. Florida Federal contends that if the Crafts approach were to prevail, the statutory design for judicial review of conversions by the United States Court of Appeals would be destroyed.
 
 
 28
 Florida Federal insists that the district court was clearly in error in holding that the stock increase approval on May 26, 1983 was not a part of the conversion plan, first because the Bank Board's approval on that date was its final action on the plan of conversion, and second, because the plan authorized a share increase supported by an updated appraisal. The Crafts argue that it is only the plan of conversion approved on April 29, 1983 that is the subject of the exclusive judicial review in the Court of Appeals, not the whole conversion process. They insist that they do not attack the contents of the plan. They argue that the plan contains a contingency provision which authorizes a share increase, but the plan does not authorize a material increase in the offering size without compliance with Section 563.b7(k)(4) and (5) the recirculation-rescission provisions of the conversion regulation. In sum, it is the Crafts' position that they had no reason to object to the plan of conversion either before or after April 29, 1983, but when the increase of stock was authorized by the Bank Board on May 26, 1983 without complying with its own regulations, the Crafts' case for rescission and money damages was properly brought in the district court.
 
 
 29
 The district court denied Florida Federal's motion to dismiss from the bench observing that the Bank Board took final action approving the plan of conversion on April 29, 1983, not on May 26, 1983, when it authorized the share increase. The court found that since the Crafts were challenging the manner in which the offering was increased without tendering rescission, they were not challenging the Bank Board's action approving the plan of conversion and therefore were not required to bring their case in a Court of Appeals. The district court certified its order for interlocutory appeal under 28 U.S.C. Section 1292(b), and we granted Florida Federal's petition for leave to appeal.
 
 
 30
 Section 5 of the Home Owners Loan Act of 1933, 12 U.S.C. Sections 1461 et seq., delegated authority to the Bank Board "under such rules and regulations as it may prescribe" to provide for the organization, incorporation, examination and regulation of federal savings and loan associations. Pursuant to this statutory mandate the Bank Board has promulgated regulations governing almost every aspect of the savings and loan industry. 12 C.F.R. pt. 563b. (1983). The statutes provide the Bank Board with comprehensive authority over the conversions of federally-chartered insured savings and loan associations to the end that such transactions are accomplished in such a manner that protects the federal interest and those of the association, its depositors, investors and borrowers, and prevents any individual or group from obtaining a windfall from pricing of the aggregate value of the converting association's stock below its fair market value. 12 C.F.R. 563b.3(a). To further this objective the Bank Board requires that the price per share of stock sold in the subscription offering be uniform with the price of shares sold to the general public in the final offering in the conversion, id. 563b.3(c)(10), and such price be set on an independent appraisal made immediately prior to the conversion, id. Section 563b.7(f).
 
 
 31
 With such an unlimited statutory horizon, see Fidelity Federal Savings and Loan Ass'n v. De la Cuesta, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664, and the Bank Board's extensive regulatory provisions exclusively governing the conversions of mutual to stock institutions, we look with a jaundiced judicial eye to Crafts' argument that, because the Bank Board's final action approving Florida Federal's application of conversion with conditions (which they claim they have no quarrel with and have not attacked) took place on April 29, 1983, that the Bank Board's subsequent action on May 26, 1983 is to be excised from the jurisdictional authority with which the Court of Appeals was clothed by the Congress.
 
 
 32
 At the risk of redundancy we emphasize that, as an absolute requirement, the converting institution must sell its capital stock at a total price equal to the estimated pro forma market value of such stock in the converted institution, based on an independent valuation, so that a windfall distribution is virtually eliminated. 12 C.F.R. 563b.c(a), 563b.3(c)(i). This is inextricably a part of the plan of conversion which the Bank Board acted upon when, on April 29, 1983, the Bank Board approved the plan of conversion conditioned upon the sale of 6.25 million shares of stock at a uniform price to be set between $15 and $20 per share.
 
 
 33
 When the Bank Board was informed by the independent appraisal that the pro forma value of the association had increased between the time of its initial approval of the plan on April 29, 1983 and May 26, 1983 the time of the Public Offering, it would have been impossible for the conversion to have proceeded without the Bank Board's approval of the plan's reserved condition to increase the number of shares to be sold to 9,350,000 at $20 per share. No petition for review was timely filed by the Crafts in the Court of Appeals although they had actual notice on May 27, 1983 of the Bank Board's approval of the increase of shares to be sold. The attack that the Crafts made in the district court, that they are entitled to rescission and damages for the failure of Florida Federal to recirculate its offering circular and tender rescission as required by 12 C.F.R. Section 763.b.7(k)(4) and (5) of the conversion regulations, and that the appraisals on which the Bank Board relied were fraudulent, are part and parcel of the plan of conversion approved by the Board. These matters are directed to the final action of the Bank Board in approving the plan of conversion and cannot be the subject of a collateral attack in the district court. Harr v. Prudential Federal Savings and Loan Ass'n, 557 F.2d 751 (10th Cir.1977), cert. denied, 434 U.S. 1033, 98 S.Ct. 766, 54 L.Ed.2d 780 (1978). See also York v. FHLBB, 624 F.2d 495 (4th Cir.1980) cert. denied, 449 U.S. 1043, 101 S.Ct. 621, 66 L.Ed.2d 504 (1980). In Harr, the Tenth Circuit affirmed the district court's dismissal for lack of subject matter jurisdiction of a remarkably similar challenge to Bank Board action. The court said:
 
 
 34
 [N]o matter how otherwise described, [the actions] must in the first instance be a challenge to the approval by the Bank Board of the plan of conversion, and the consideration of the proxy materials ... (i)t is based on the consequences or impact of the plan on the plaintiffs. The regulations of the Bank Board ... clearly extend to the ... materials and events here concerned ...
 
 
 35
 The complaint is directed to matters which are part and parcel of the plan of conversion approved by the Board ...
 
 
 36
 ... the relief sought can only be afforded by a challenge to the Bank Board's actions as the basic decision and authorization for the acts and consequences complained of. Anything else would be directed to derivative and secondary matters, and would, for all practical purposes, be a collateral attack on the decision. The statutory provisions are directed to this end and we hold that the remedy created is exclusive under these circumstances.
 
 
 37
 Harr at 753-54.
 
 
 38
 The Crafts attempt to distinguish these cases because they involved challenges to a plan of conversion itself, while the Crafts insist that they do not challenge Florida Federal's plan of conversion. This attempt falls far short of its intended mark. The core of the Crafts' grievance is that a large increase in the sale of stock in the Public Offering was granted, allegedly improperly, without a corresponding right of rescission for original subscribers. It is readily apparent that such an event was not only made possible by the terms of the plan of conversion, but in fact it was required by those very terms. Because the shares to be issued in the Public Offering had to accurately reflect the true pro forma market value of the association at that time, to have sold fewer shares would have violated the mandate of the plan of conversion. The increase in the final appraisal and the number of shares offered in the Public Offering are material changes as to previous estimates of total market value of the converting institution and, consequently, as to previous projections of shares to be sold in the Public Offering. However, we disagree with the Crafts that this triggered their right of rescission. The statutory language of Section 563b.7(k)(4) calls for filing of a "post-effective amendment to the subscription offering circular upon the occurrence of any event ... which would be material to the investment decision of a subscriber." (Emphasis added). The original subscription offering materials, and the plan itself, contained language designed to apprise subscribers of the possibility of increase or decrease in shares to be offered in the Public Offering. Thus, the investors were properly forewarned of potential variations in the sale of stock in the Public Offering. Crafts argue that a fifty percent increase is sufficiently material to have changed the investment decisions of subscribers and, thus, should have triggered the right of rescission. However, their investment decision was subject to the notice provision of potential adjustment without limit, and they could have guided their investment decision accordingly.
 
 
 39
 The Crafts finally contend that a large increase in the Public Offering was not subject to any control because the Bank Board takes no steps to verify the accuracy of the appraisal, thereby leaving the door open for fraud. This is not entirely accurate, but, accepting without agreeing with these arguments, it is clearly then the plan of conversion which itself is flawed, both as to lack of limitation on share offering adjustments and as to auditing control. Thus, the district court's finding that the Crafts were not challenging the final action approving the plan of conversion is clearly erroneous. To hold otherwise would be to ignore the fact that the share increase was an essential component of the plan of conversion, a provision which became operational upon the occurrence of a spelled out contingency. The Crafts claim they could not have known of their plight at the time of approval of the plan of conversion because it occurred only upon operation of the condition a month later. However, the open-ended adjustment provision in the plan and the subscription materials could have been challenged from the outset. When they learned of the increased valuation on May 27, 1983, they had another opportunity to seek review of the allegedly flawed provisions of the conversion plan. Moreover, the notice of final action was not published in the Federal Register until July 15, 1983, and the Crafts had thirty days from that date to seek review. In sum, the plan of conversion contained a condition which permitted adjustments in the Public Offering without limits. The condition became operative after the close of the subscription offering and caused a substantial upward adjustment in the stock offered. Any challenge to this provision in the plan and its subsequent operation without limit is a challenge to the plan of conversion itself, and the exclusive forum for review is the Court of Appeals.
 
 
 40
 Finally, Crafts argue that the district court has jurisdiction under Section 12(2) and Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10-b, and Section 517.301 of the Florida Blue Sky Laws. They contend that under the anti-fraud provisions of the federal securities laws, Florida Federal had a continuing duty to keep its subscription offering circular current by disclosing all factors relating to the offering which could be material to an investor. Thus, there was a violation of the Exchange Act and Section 12(2) of the Securities Act by the failure of Florida Federal to sticker its offering circular to disclose the share increase on May 26, 1983 and tender rescission to investors in the subscription offering. This being so, it is argued that the Review Statutes do not divest the district court of jurisdiction under the securities laws for anti-fraud actions relating to a securities offering which occurs after final Bank Board action approving a plan of conversion. We view the Crafts anti-fraud claims as bare bones allegations made to escape the exclusive review provisions of the Review Statutes. They do not allege any false or misleading statements. The allegations concerning Kidder's final appraisal are conclusory and fail to show that they made any purchases in reliance on it. Kidder is not named as a defendant in this action. All of the claims derive from Crafts' basic contention that they were entitled by the Bank Board's regulations to be resolicited after the Bank Board approved the updated appraisal and the issuance of additional conversion stock.
 
 
 41
 A comparison of the anti-fraud allegations of the complaint in Harr parallel those made by Crafts. The claims in Harr were pleaded as if arising under Sections 12(2) and 17 of the 1933 Act and Rule 10b-5 adopted under the 1934 Act. They included a conspiracy to defraud, a fraudulent appraisal, misrepresentations and failure to disclose--allegations even broader than in this case. The Tenth Circuit gave little pause to the securities gloss on the anti-fraud allegations.
 
 
 42
 [W]e must hold that the cause of action, no matter how otherwise described, must in the first instance be a challenge to the approval by the Bank Board of the plan of conversion, and the consideration of the proxy materials ... The attempted reliance on Rule 10b-5 is at best a secondary or derivative position ...
 
 
 43
 * * *
 
 
 44
 As we have stated above, the sole thrust of plaintiffs argument is directed to what in reality was the agency decision. This attack cannot be changed in its substance by a Rule 10b-5 gloss in what is really a collateral proceeding directed to derivative matters or consequences.
 
 
 45
 Harr, 557 F.2d at 753-54.
 
 
 46
 Before departing from this subject we add this word of caution. We are not called upon here to decide, nor do we express any views concerning the jurisdiction vel non of the district court under the federal securities laws when securities fraud is properly alleged and there has been Bank Board approval of a savings and loan conversion.
 
 
 47
 No more than a short answer to the purported state law claims is required. To exercise its jurisdiction the district court would first have to have federal subject matter jurisdiction in this case, which it does not. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 725-27, 86 S.Ct. 1130, 1138-40, 16 L.Ed.2d 218 (1966); Williams v. Bennett, 689 F.2d 1370, 1379 (11th Cir.1982), cert. denied, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).
 
 
 48
 The district court was without subject matter jurisdiction to entertain this case. The denial of Florida Federal's motion to dismiss the complaint is reversed and the case is remanded with directions to dismiss the complaint.
 
 
 49
 REVERSED and REMANDED with directions.