Robert L. DOUGHERTY, Plaintiff,

v.

CARVER FEDERAL SAVINGS
BANK, et al., Defendants.

No. 95 Civ. 2249 (CBM).

United States District Court,
S.D. New York.

Jan. 4, 1996.

Bruce E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, New York City, for plaintiff Dougherty.

Daniel A. Pollack, Martin I. Kaminsky and Edward T. McDermott, Pollack & Kaminsky, New York City, for Carver defendants.

Jerome K. Walsh, Lane & Mittendorf, New York City, for Capital Resources defendants.

### AMENDED OPINION

MOTLEY, District Judge.

The instant case, filed as a class action, arises out of events connected to the conversion of Carver Federal Savings Bank (Carver) from mutual to stock ownership. The

complaint alleges that defendants—Carver, its Board of Directors, and agents—committed several fraudulent acts in violation of the securities laws during the sale of Carver stock resulting from this conversion.

The Office of Thrift Supervision (OTS), the federal agency that oversees federally insured savings institutions like Carver, approved the instant conversion. The OTS's authorizing statute provides that challenges to a decision of the director of the OTS, including the decision to approve the type of conversion at issue here, must be brought by a party aggrieved by the decision in the court of appeals in the circuit in which the party has a principle office, or in the Court of Appeals for the District of Columbia Circuit. 12 U.S.C. § 1467a(j) (1994). Defendants argue that plaintiff, in effect, challenges the conversion's approval by the OTS and the court of appeals has primary jurisdiction over such an action. Accordingly, defendants ask this court to dismiss the instant matter for want of subject matter jurisdiction.

In opposition, plaintiff argues that allegations concerning fraud such as those involved in the instant case are generally recognized as arising outside the scope of OTS review and thus lying beyond the reach of the primary jurisdiction of the court of appeals.

As described below, however, plaintiff cannot show that the complaint is directed solely at defendants' alleged fraud; rather, it is a thinly veiled collateral attack on OTS actions. Accordingly, plaintiff may not proceed in this court and the instant action must be dismissed.

## BACKGROUND

The named representative of the plaintiff class in this action, Robert L. Dougherty (hereinafter "plaintiff"), purchased 15,000 shares of Carver stock at a total price of $150,000.00. (Complaint at ¶ 6; Def.Mem. at 6.),[1] through Carver's OTS-approved conversion from mutual to stock ownership.

Defendant Carver Federal Savings Bank ("Carver") is a federally chartered savings bank. (Complaint at ¶ 10.) As such, it is regulated by the OTS and its conversion from mutual to stock ownership was subject to OTS approval. See, e.g., 12 U.S.C. §§ 1464(i)(1) and 1464(i)(2)(A) (1994).[2] Defendant Capital Resources Group, Inc. ("CRG") provided appraisal services to Carver in connection with Carver's conversion. (Complaint at ¶ 9.) Defendant Capital Resources, Inc. ("Capital Resources") was the "financial consultant and sales agent" for Carver with regard to the conversion. (Complaint at ¶ 1.)[3] The individually named defendants, Richard T. Greene, M. Moran Weston, David R. Jones, Benjamin W. Watkins, Herman Johnson, Biswarup Mukherjee, Howard R. Dabney and Margaret R. Lewis (hereinafter the "Individual Defendants") were, at all relevant times, executive officers of Carver. (Complaint at ¶ 10.)

**1.** All references throughout the opinion to "Defs.Mem." refer to the Memorandum of Law in Support of Defendants' Motion to Dismiss, filed by Carver and the individual defendants. Capital Resources, Inc. and Capital Resources Group, Inc. (collectively, "the Capital Resources Defendants") filed a similar motion that raised the same argument for dismissal but explained in greater detail the role of the appraiser in the underlying dispute and the effect of the statutory review provisions on this particular matter. See Capital Resources Defs.Mem.Supp.Mot. to Dismiss.

**2.** In response to the Savings and Loan Crisis of the 1980's, Congress enacted sweeping changes to the banking industry through the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183 (1989) (codified at various sections of 12 U.S.C.). See, e.g., United States v. Gaubert, 499

U.S. 315, 319 n. 1, 111 S.Ct. 1267, 1271 n. 1, 113 L.Ed.2d 335 (1991). FIRREA abolished the Federal Home Loan Bank Board (FHLBB) and vested much of its authority in the newly organized Office of Thrift Supervision. See e.g., Id., at §§ 201(b) (deleting reference to FHLBB from various sections of 12 U.S.C.) and 401(a)(2) (abolishing FHLBB).

**3.** Plaintiff also alleges that CRG is a "wholly owned subsidiary" of defendant Capital Resources. (Complaint at ¶ 9.) Defendants CRG and Capital Resources state that Capital Resources is actually the subsidiary of CRG. Capital Resources Defs.Mem.Supp.Mot. to Dismiss at 2 n. 1. Although plaintiff's allegations in this regard should be accepted as true (See infra., n. 4), the correct corporate relationship between these co-defendants is irrelevant to this motion, however.

On June 21, 1994,[4] the Board of Directors of Carver unanimously adopted a Plan of Conversion (hereinafter "the Plan") pursuant to which Carver would be converted from a federal mutual savings bank to a federal capital stock savings bank.[5] (Complaint at ¶ 24.) To effectuate the Plan, Carver retained Capital Resources as the underwriter for the conversion.[6] In early July, 1994, Carver filed an application with the OTS for permission to carry out the conversion. Carver's Plan, an appraisal prepared by CRG of the estimated *pro forma* market value of the common stock to be issued upon conversion, and a proposed Offering Circular were filed with the OTS. (Defs.Mem. at 3; Pollack Aff.Exhs. 1–4.)

Under OTS regulations, a converting savings institution must issue and sell its capital stock at an aggregate price equal to the estimated *pro forma* market value of that stock. 12 C.F.R. § 563b.3(c)(1) (1995). Prior to the actual sale of the stock, an initial appraisal of the value of the converting institution must take place. Subsequent to this appraisal, an "estimated price range" or "valuation range" is set. This valuation range establishes a scope that may vary 15% from the initial appraisal's assessment of the value of the institution (both greater and less than this percentage). It is within this range that the ultimate value of the total stock offered must fall. *See, e.g.,* 12 C.F.R. § 563b.7(c) (1995).

CRG initially appraised the estimated *pro forma* market value of Carver's common stock at $17,500,000. In accordance with OTS regulations described above, the Offering Circular disclosed that the Carver valuation range was from $14,875,000.00 to $20,125,000.00. Because shares were to be offered at a price of $10 per share, Carver could issue between 1,487,500 and 2,012,500 shares. (Pollack Aff.Ex. 4 at 1, 6, 94.)

Both the Plan and the Offering Circular provided that Carver's appraised value—and the corresponding number of shares to be offered—could change, however. On August 12, 1994, the OTS approved the application for conversion, including a clause providing for a possible increase in the number of shares to be offered to 2,314,375, should the appraised value of Carver increase. (Pollack Aff.Ex. 6.) On August 15, 1994, the OTS approved the materials to be used in connection with the conversion, including the Offering Circular which disclosed that Carver might sell up to 2,314,375 shares at $10 per share based on an improved appraisal. (Pollack Aff.Ex. 7.) On August 23, 1994, OTS published notice of its final action approving the transaction in the Federal Register. (Pollack Aff.Ex. 8.)

---

**4.** Except for those allegations regarding fraud, the facts as alleged by the plaintiff and defendants are virtually identical. The motion of Carver was supported by an affidavit of its counsel, to which many of the documents referred to herein were annexed as exhibits. *See* Affidavit of Daniel A. Pollack, Esq., dated July 17, 1995 (hereinafter "Pollack Aff."). Even assuming, as the court must, that the plaintiff's allegations concerning fraud in the conversion process are true, *Atlantic Mutual Insurance Company v. Balfour Maclaine International, Ltd.,* 968 F.2d 196, 198 (2d Cir.1992), on this motion to dismiss based on subject matter jurisdiction, the court may consider documentary evidence submitted by the moving party, *Kamen v. American Telephone & Telegraph Co.,* 791 F.2d 1006, 1010–1011 (2d Cir.1986), especially where, as here, documents pertaining to plaintiff's challenge were neither annexed to the complaint nor incorporated by reference therein. It is also important to note that the court need not consider all inferences in favor of the plaintiff when considering the court's jurisdiction over the instant matter. *Atlantic Mutual,* 968 F.2d at 198.

**5.** These two forms of ownership differ as follows:

> The mutual form of organization is an odd duck. Nominally the customers own the mutual, but it is ownership in name only. They cannot sell what they 'own', and if they withdraw savings they receive only the nominal value of the account rather than a portion of the mutual's net worth, which is valuable to them only to the extent it permits the bank to pay higher interest.... Increasing competition among financial institutions has led to pressure to replace the mutual form with a stock form that assigns ownership interests more explicitly and makes them transferable. *Ordower v. Office of Thrift Supervision,* 999 F.2d 1183, 1185 (7th Cir.1993).

**6.** Plaintiff alleges that although Capital Resources would receive less than $100,000.00 if the Plan was not carried out, the underwriter could earn over $600,000.00 with the Plan's success because its compensation was tied directly to the total dollar amount of the shares of stock sold. (Complaint at ¶¶ 25–26.)

Under the Plan, Carver was to issue its stock through both a subscription and a public offering. (Pollack Aff.Ex. 4 at 1, 84.) The subscription offering period was scheduled to end on September 22, 1994. (*Id.* at 5.) On or before the expiration of the subscription offering period, plaintiff ordered 15,000 shares of Carver stock at a total cost of $150,000.00. (Complaint at ¶¶ 3, 6; Pollack Aff.Ex. 9; Defs.Mem. at 6).

On October 4, 1994, CRG submitted to the OTS an updated appraisal that increased the estimated *pro forma* market value of Carver by 15% to $20,125,000.00, resulting in a revised valuation range of $17,106,250.00 to $23,143,750.00. (Pollack Aff.Ex. 12.) That same day, the OTS approved this final appraisal and specifically authorized Carver to sell up to $23,143,750.00 worth of stock. (Pollack Aff.Ex. 13.) Armed with this approval, Carver issued the maximum permissible number of shares—2,314,375—at a price of $10.00 per share. (Complaint at ¶ 57; Defs.Mem. at 7.) As of March 14, 1995, Carver stock was trading at $6.625 per share. (Complaint at ¶ 27.)

The complaint in the instant action was filed on April 5, 1995, alleging that defendants made material misrepresentations or omissions in the Offering Circular. First, while the Circular represents that the underlying appraisal was prepared by an independent appraiser, the complaint alleges that the defendants fraudulently failed to disclose that CRG's affiliate, Capital Resources, Inc., had a financial interest in the outcome of the conversion. Second, the Offering Circular represented that the initial appraisal was credible and reliable when, it is alleged, the appraisal was factually false and misleading. Third, although the Circular stated that the number of shares to be issued would not exceed 2,012,500 unless recent market and economic conditions warranted such an increase based on an updated appraisal, the number of shares issued was increased beyond this level despite allegedly worsening market and economic conditions. Based on these alleged misrepresentations and omissions, plaintiff contends that defendants violated Sections 12(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77l(2), 77o (1994); Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) (1994); Rule 10b–5 promulgated by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5 (1995); and the state common law doctrines prohibiting breach of fiduciary duty and breach of contract.

By Motion dated July 17, 1995, Carver and the Individual Defendants filed a motion to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Defendants CRG and Capital Resources filed a similar motion adopting the position of Carver and the Individual Defendants, but adding more detailed analysis of the OTS role in reviewing the independence of the appraiser in a conversion.

## ANALYSIS

## I. JURISDICTION OVER PLAINTIFF'S FEDERAL SECURITIES FRAUD CLAIMS.

### A. Overview of Specialized Review Provisions of Agency Action.

"It can hardly be doubted that Congress, acting within its constitutional powers, may prescribe the procedures and conditions under which, and the court in which, judicial review of administrative orders may be had." *City of Tacoma v. Taxpayers of Tacoma,* 357 U.S. 320, 336, 78 S.Ct. 1209, 1218, 2 L.Ed.2d 1345 (1958). In many instances, Congress has vested the court of appeals with primary jurisdiction to review actions of federal agencies.[7] According to statute, a decision of the director of the OTS, like the approval of the

---

7. *See e.g., Board of Governors of the Federal Reserve v. MCorp. Financial Inc.,* 502 U.S. 32, 37–38, 112 S.Ct. 459, 462–463, 116 L.Ed.2d 358 (1991) (describing statutory provisions establishing court of appeals review of the decisions of the Board of Governors of the Federal Reserve); *Federal Communications Commission v. ITT World Communications,* 466 U.S. 463, 468, 104 S.Ct. 1936, 1939–40, 80 L.Ed.2d 480 (1984) (describing jurisdiction of court of appeals to review final FCC orders); *National Parks and Conservation Assoc'n v. Federal Aviation Administration,* 998 F.2d 1523, 1526–1527 (10th Cir.1993) (describing court of appeals review provisions for acts of the FAA).

Plan challenged herein, must be brought in the court of appeals in the first instance.[8]

Such specialized procedures are utilized by Congress in an attempt to streamline administrative and judicial efforts by both preventing parallel proceedings before an administrative agency and a district court, especially where the agency may engage in extensive fact-finding and review of the law in the first instance, *Whitney National Bank v. Bank of New Orleans,* 379 U.S. 411, 422, 85 S.Ct. 551, 558–59, 13 L.Ed.2d 386 (1965), and by lessening the potential for conflicting district court opinions on matters of law arising out of challenges to agency action. *Fort Worth National Corporation v. Federal Home Loan Bank Board,* 469 F.2d 47, 52 (5th Cir.1972). Such mechanisms curb piecemeal judicial review, permitting the agency to bring its expertise to bear on a problem, *Whitney National Bank,* 379 U.S. at 422, 85 S.Ct. at 558–59, and allowing the court of appeals to develop its own familiarity with a given area of law in which such specialized procedures apply. *Telecommunications Research and Action Center v. Federal Communications Commission,* 750 F.2d 70, 78 (D.C.Cir.1984).

■■ The original jurisdiction of the court of appeals over a particular claim depends upon the substance of that claim and the extent to which such claim falls within the scope of the subject matter of the legislatively crafted review procedure. *See, e.g., McNary v. Haitian Refugee Center,* 498 U.S. 479, 491–493, 111 S.Ct. 888, 895–897, 112 L.Ed.2d 1005 (1991) (holding challenge to manner in which INS carried out a particular program could be brought in district court even though individual decisions under same had to be maintained in the courts of appeals); *cf. Florida Power & Light Company v. Lorion,* 470 U.S. 729, 737–740, 105 S.Ct. 1598, 1603–1605, 84 L.Ed.2d 643 (1985) (holding Congress intended scope of statute providing for primary jurisdiction of court of appeals to depend upon subject matter of claim and not underlying procedures utilized by the agency in a given decision). Where a statute so provides, these specialized procedures vesting jurisdiction over challenges to agency action in the courts of appeals are considered the exclusive means of judicial review. *Whitney National Bank,* 379 U.S. at 422, 85 S.Ct. at 558–559 (1965); *See, e.g., Michael v. INS,* 48 F.3d 657, 661 (2d Cir. 1995) (describing "direct and exclusive" review procedures to the court of appeals for aliens challenging final deportation orders); *cf.* 5 U.S.C. § 703 (holding venue of and jurisdiction over action seeking review of agency action will first depend upon relevant statute providing for review, if any).

### B. Review of Decisions of the Director of the OTS.

Consistent with this body of jurisprudence, courts reviewing actions such as the one at issue here routinely find that the mechanisms for appellate review provide the exclusive means for challenging agency decisions.[9]

---

8. The statute governing conversions of savings institutions from mutual to stock ownership provides expressly for challenges to OTS approval of plans of conversion as follows:

No savings association may convert from the mutual to the stock form, or from the stock form to the mutual form, except in accordance with the regulations of the Director.

Any aggrieved person may obtain judicial review of a final action of the Director which approves or disapproves a plan of conversion pursuant to this subsection only by complying with the provisions of section 1467a(j) of this title within the time limit and in the manner therein prescribed, which provisions shall apply in all respects as if such final action were an order the review of which is therein provided for, except that such time limit shall commence upon publication of notice of such final action in the Federal Register or upon the giving of such general notice of such final action as is required by or approved under regulations of the Director, whichever is later.
12 U.S.C. § 1464(i)(2)(A)–(B) (1994).

The referenced portion of Section 1467a provides in pertinent part as follows:

Any party aggrieved by an order of the Director under this section may obtain a review of such order by filing in the court of appeals of the United States for the circuit in which the principal office of such party is located, or in the United States Court of Appeals for the District of Columbia Circuit, within 30 days after the date of service of such order, a written petition praying that the order of the Director by modified, terminated, or set aside.
12 U.S.C. § 1467a(j) (1994).

9. With the exception of a passing mention in dicta in one district court opinion of the scope of 28 U.S.C. § 1467a(j) as it relates to claims of securities fraud alleged to have been carried out

*Craft v. Florida Fed. Sav. & Loan Ass'n,* 786 F.2d 1546, 1552–1553 (11th Cir.1986); *Harr v. Prudential Fed. Sav. & Loan Ass'n,* 557 F.2d 751, 752 (10th Cir.1977), *cert. denied,* 434 U.S. 1033, 98 S.Ct. 766, 54 L.Ed.2d 780 (1978).[10]

Relying upon various OTS regulations providing that the agency does not pass upon the adequacy of the proxy or subscription offering materials used in connection with an agency-approved transaction,[11] courts have held that allegations of fraud in such materials can advance in the district court because they raise issues beyond agency authority and thus outside the scope of the primary jurisdiction of the court of appeals. *Reschini v. First Fed. Sav. & Loan Ass'n,* 46 F.3d 246, 251–53 (3d Cir.1995); *Ordower v. Office of Thrift Supervision,* 999 F.2d 1183, 1188 (7th Cir.1993); *Rembold v. Pacific First Fed. Sav. Bank,* 798 F.2d 1307, 1309 (9th Cir. 1986), *cert. denied,* 482 U.S. 905, 107 S.Ct. 2480, 96 L.Ed.2d 373 (1987). *Cf. Thrift Depositors of America v. Office of Thrift Supervision,* 862 F.Supp. 586 (D.D.C.1994) (holding challenge to OTS adoption of internal agency rule does not involve agency approval of a specific transaction and may be maintained in the district court in the first instance).

Because of the importance of protecting the integrity of the statutorily vested primary jurisdiction of the courts of appeals and its purposes, however, courts in these circumstances must review securities fraud allegations carefully to insure that litigants do not attempt to circumvent the statutory jurisdiction of the court of appeals by mischaracterizing the substance of the claims at issue. *See, e.g., Ordower v. Office of Thrift Supervision,* 999 F.2d at 1188 (cautioning district court to insure, on remand, that securities fraud claims in complaint did not amount to "collateral attack" on the decision of the OTS); *Harr v. Prudential Fed. Sav. & Loan Ass'n,* 557 F.2d at 753 (holding court of appeals only forum for complaint attacking the substance of the conversion plan approved by the agency and that plaintiff's allegation of securities fraud was "at best a secondary or derivative position."); *cf. Sutton v. U.S. Dep't of Transportation,* 38 F.3d 621, 625–26 (2d Cir.1994) (holding party's characterization of complaint irrelevant to jurisdictional issue and the district court may not entertain an action if claims found therein are based in substantial part on matters covered by statute providing for court of appeals review of agency action in the first instance).

## C.  Plaintiff's Claims.

In the instant case, plaintiff argues that its allegations concerning fraud committed by defendants throughout the course of the stock conversion fall outside the scope of 12 U.S.C. § 1467a(j) and thus the instant action may be maintained in the district court. The court shall discuss each of plaintiff's charges of fraud in turn, beginning with the Offering Circular's purported misstatements concerning the first appraisal.

### 1.  The Offering Circular's misrepresentations concerning the initial appraisal.

■  Plaintiff describes the Offering Circular's purported material misrepresentation regarding the initial appraisal as follows:

> [T]he Offering Circular fails to disclose that the initial appraisal was false and misleading in that the appraiser considered only positive factors which purportedly supported a higher appraisal, while disregarding or giving no weight to admittedly

during a savings institution conversion similar to the one at issue here, *Cagan v. Anchor Savings Bank FSB,* No. CV–88–3024, 1990 WL 73423, at *14 (E.D.N.Y. May 22, 1990), neither the Second Circuit nor the district courts therein have reached the issues before the court: i.e., the applicability of 28 U.S.C. § 1467a(j) to claims of securities fraud in subscription offering materials related to savings institution conversions from mutual to stock ownership; the exclusive nature of the primary jurisdiction of the court of appeals for review of challenges to such plans of conver-

sion; the degree to which even collateral attacks on such plans are subject to court of appeals review in the first instance.

**10.** *Harr* involved a challenge to actions of the OTS predecessor agency, the Federal Home Loan Bank Board. *See supra.,* n. 2.

**11.** *See, e.g.,* 12 C.F.R. §§ 563b.7(d) and 563b.5(g)(2) (1995).

substantial, known, negative factors which should have materially decreased the initial appraisal value.

(Complaint at ¶ 44.)

Despite plaintiff's reverent securities fraud incantations, this set of allegations is little more than a thinly veiled attack on the factual and analytical support for the appraisal submitted to the OTS. Indeed, the Complaint itself refers to the Offering Circular tangentially as set forth above, but continues on at great length criticizing the appraiser's balancing of factors through which the conclusions contained in its appraisal were reached. (Complaint at ¶¶ 45–54.) Moreover, the complaint insists that "[i]n order to justify [the premium value of the stock contained in the appraisal] CRG would have had to document and explain" its conclusions (to, presumably, the OTS). (Complaint at ¶ 52.)[12] Plaintiff's self-serving characterization of his claims to the contrary notwithstanding, it is inescapable that the instant challenge is to the valuation resulting from the appraisal, an item reviewed by, and squarely within the authority of, the OTS.

It is hard to ignore the OTS's regulations that themselves provide:

> The [pricing] materials [of the conversion plan] shall contain a full appraisal, including a complete and detailed description of the elements that make up an appraisal report, justification for the methodology employed and sufficient support for the conclusions reached therein[.]

12 C.F.R. § 563b.7(f)(1)(ii) (1995). *See also* 12 C.F.R. § 563b.7(f)(1)(iii) (1995).

Plaintiff clearly disagrees with the appraisal's "justification," its "methodology" and the "sufficien[cy]" of its "support" for the valuation of Carver contained therein. (Complaint at ¶¶ 44–54.) Were plaintiff to proceed with his challenge in this court, the ensuing litigation would necessarily require review of the valuation of the stock in the conversion, a matter clearly approved by the OTS. Once again, the heart of this portion of the complaint is that the Offering Circular failed to disclose that the appraisal was false and misleading (Complaint at ¶ 44); without an analysis of the appraisal and resulting valuation, then, the court could not possibly determine if the appraisal was indeed 'false and misleading'. Such review would necessarily require inquiry into the same matters approved by the OTS; indeed, it is unavoidable that such inquiry would ultimately require actual *review* of the OTS-approved valuation.[13] Accordingly, the proper forum for plaintiff's challenge is the court of appeals because this matter falls within the regulatory scope of OTS authority and is thus subject to review by the court of appeals in the first instance under 12 U.S.C. § 1467a(j).

The court in *Ordower*,[14] while remanding the matter back to the district court to review plaintiff's allegations concerning fraud in the proxy materials at issue there, expressly found that the court of appeals retains primary jurisdiction over a challenge to the substance of an OTS-approved transaction, including an attack on the value of the stock as proposed by the defendant savings institution,[15] because the approval of such

---

**12.** The full text surrounding the excerpted portion of the complaint provides as follows:

Thus, Carver stock was appraised at a value which constituted a substantial *premium* over purportedly comparable banks. In order to justify such a premium, CRG would have had to *document and explain substantial factors* demonstrating Carver's superiority over the comparable banks in other aspects relevant to Carver's valuations.

Rather than enumerating factors demonstrating Carver's superiority over the purportedly comparable banks, however, CRG's appraisal report is replete with data demonstrating that Carver's financial performance was significantly *worse* than comparable banks.

(Complaint at ¶¶ 52–53) (emphasis in original).

**13.** Similarly, a decision in favor of the plaintiff would require substitution of the court's judgment for that of the OTS.

**14.** In *Ordower,* the Court of Appeals for the Seventh Circuit reviewed the following "in tandem": 1) a decision of the district court that dismissed an action challenging OTS approval of a conversion and raising claims of securities fraud on the part of private actors involved therein; and, 2) a petition, filed in the first instance in the court of appeals, to review that agency decision. 999 F.2d at 1184.

**15.** Plaintiff in *Ordower* criticized defendant there for *undervaluing* the savings institution's net worth. 999 F.2d at 1185.

valuation was within the OTS authority: a holding it considered "unexceptionable." 999 F.2d at 1188. Indeed, the *Ordower* court cautioned against arguments such as those raised by the plaintiff herein, i.e., that his attack is directed at the adequacy of the *circular* based on its reference to a flawed appraisal, when it found: "[Plaintiff] may not wage a collateral attack on the valuation approved by the OTS *by describing the repetition of that valuation in the proxy materials as a form of fraud or deceit.*" *Id.* (emphasis added). Here, the substance of plaintiff's attack is clearly the valuation that resulted from the appraisal. Plaintiff cannot attack the factual and analytical conclusions of the appraisal in the district court merely by attacking the offering circular's promise of a truthful and accurate appraisal and calling such guarantee a form of fraud.

In *Harr v. Prudential Savings and Loan, supra.*, the court criticized plaintiffs' attempts to bootstrap an attack against the OTS decision by challenges to "derivative matters," which, this court assumes, would include the instant challenge to the Offering Circular's mention of the purportedly defective appraisal. The *Harr* court found as follows:

> The subject matter, the nature of plaintiffs' claim, and

>> the arguments before this court demonstrate that the relief sought can only be afforded by a challenge to the Bank Board's action as the basic decision and authorization for the acts and consequences complained of. Anything else would be directed to derivative and secondary matters, and would, for all practical purposes, be a collateral attack on the decision. The statutory provisions are directed to this end and we hold that the remedy created is exclusive under these circumstances.

> .  .  .  .  .

> ... [T]he sole thrust of plaintiffs' argument is directed to what in reality was the agency decision. This attack cannot be changed in its substance by a Rule 10b–5 gloss in what is really a collateral proceeding directed to derivative matters or consequences. The fact that the complaint is

directed to such derivative consequences, of course, indicates that it is a collateral attack.

557 F.2d at 754.

Today's holding is not inconsistent with those previously mentioned decisions in which courts found that securities fraud allegations are considered cognizable in the district court. In *Rembold, supra.*, plaintiffs there stated that it was the subscription offering circular itself that contained misrepresentations concerning the value of the savings institution's assets and failed to disclose "information regarding management strategies ... about the magnitude, timing, and effect of a second stock offering." 798 F.2d at 1307. Here, unlike in *Rembold,* plaintiff alleges that the Offering Circular's *endorsement* of the appraisal's conclusions—conclusions that were purportedly wrong—stands alone as a form of actionable fraud. The court in *Reschini* stated that plaintiffs there had alleged that the proxy materials used in a conversion contained material misrepresentations and failed to disclose information about the proposed transaction. 46 F.3d at 248. Here, the purported fraudulent statement involves the offering circular's description of the appraisal, an item expressly reviewed and authorized by the OTS.

As set forth above, were plaintiff's suit to proceed at the district court level, it is inescapable that the court would have to review the decisions of the OTS at the heart of the dispute. Such review would require the court to evaluate the regulators' approval of this appraisal. Such *de novo* review at the district court level would thoroughly undermine the purposes of 12 U.S.C. § 1467a(j) that vests primary jurisdiction over administrative decisions in the court of appeals: it would subvert the expertise of the OTS and unduly burden the courts and litigants. *See, e.g., Whitney National Bank,* 379 U.S. at 421–422, 85 S.Ct. at 557–559.

**2. Plaintiff's Challenge to the Second Appraisal.**

Similar to the allegations described above, plaintiff criticizes the factual and analytical support for CRG's final appraisal and Car-

ver's resulting decision to increase the number of shares to be issued in the conversion. Although the Offering Circular stated that any updated appraisal would be reliable and based on consideration of all relevant factors, plaintiff alleges that the final appraisal raised the estimated *pro forma* market value of Carver's stock despite plaintiff's contention that Carver's financial performance and condition had worsened significantly since the initial appraisal. The complaint describes in great detail the extent to which plaintiff disagrees with the justifications and bases of the appraisal, underscoring the fact that it is the *appraisal* itself and not the Offering Circular that is challenged in this action. (Complaint at ¶¶ 59–76.)

This set of allegations, like that described above, amounts to nothing more than a collateral attack on both the final appraisal and the entire Plan as approved by the OTS, which permitted the final sale of stock at the level to which plaintiff objects. As with the attack on the initial appraisal, plaintiff is seeking nothing more than judicial review of the OTS's decision to approve both the final appraisal and the originally approved Plan, which, together, permitted and justified the sale of the stock at the price and number actually carried out. The court in *Craft, supra,* expressly found that a challenge to a provision in a plan allowing for an increase in the value of the shares sold through a conversion "is a challenge to the plan of conversion itself, and the exclusive forum for review is the Court of Appeals." 786 F.2d at 1553. Therefore, plaintiff's claims relate to questions decided by the OTS, and this Court is statutorily barred from reviewing them.

■ Plaintiff relies on *Rembold, supra,*[16] for the proposition that district court jurisdiction is necessary in the instant case to review the allegations concerning fraud in the Offering Circular as it relates to the second appraisal, which made possible the sale of over 230,000 shares, because such appraisal occurred more than 30 days *after* the initial publication of the approval of the conversion in the Federal Register. *See*

Plaintiff's Mem. in Opp. to the Mots. to Dismiss at 20. The timing of the October approval in and of itself has no bearing on the application of 12 U.S.C. § 1467a(j) in this instance, however. As stated above, the October approval of the new valuation was a contingency spelled out and planned for within the whole conversion as it was approved by the OTS. A suit advanced in the district court based solely on the second appraisal, because it would necessarily entail investigation into the validity of the entire transaction, would not only result in the indefensible and unworkable bifurcation of the challenge, but also the inescapable review of the entire transaction, even those elements clearly within the scope of 12 U.S.C. § 1467a(j). Such consequences undermine the purpose of court of appeals review and the jurisdiction of the district court is precluded. *See e.g. Whitney National Bank,* 379 U.S. at 422, 85 S.Ct. at 558–559; *cf. Florida Power & Light Company v. Lorion,* 470 U.S. at 739, 105 S.Ct. at 1604–1605 (finding Congress intended that court of appeals review depends on subject matter of the agency action in question and not "by reference to the procedural particulars of the Commission action."); *Sutton v. U.S. Dep't of Transportation,* 38 F.3d at 625–26 (2d Cir.1994) (relying on provisions governing review of actions of the Federal Aviation Administration, holding district court may not entertain an action, or bifurcate any claims thereof, if claims found therein are based in "substantial part" on matters covered by statute providing for court of appeals review of agency action in the first instance). Moreover, as the court noted in *Craft, supra,* however, plaintiff could have challenged the August 1994 approval of the Plan which authorized the potential offering of the number of shares actually carried out. 786 F.2d at 1552–1553 (holding attack on plan's share increase which occurred after a planned contingency was an attack on the plan itself as approved by the OTS and thus subject to court of appeals review in the first instance).

---

**16.** 798 F.2d at 1311 (noting harshness of application of 30–day statute of limitations in suits challenging agency action where such actions involve claims of securities fraud because of the potential inability to detect such fraud within this time frame).

Plaintiff also states that the OTS decision approving the second appraisal was never published in the Federal Register. (Plaintiff's Mem. in Opp. at 20 n. 2.) OTS failure to publish notice of this decision in the Federal Register does not demonstrate, however, that it is not the type of decision that can only be reviewed in the first instance in the court of appeals. A more logical conclusion is drawn from the failure of the OTS to publish notice of the October approval, however; to wit, this decision was an integral part of an OTS-approved conversion and notice of such approval had already been published in the Federal Register.

Today's holding does not deny plaintiff his day in court merely because application of the statute of limitations of 12 U.S.C. § 1467a(j) [17] may now bar any original suit in the court of appeals in the instant matter, however. *Cf. Leedom v. Kyne,* 358 U.S. 184, 192–193, 79 S.Ct. 180, 185–186, 3 L.Ed.2d 210 (1958) (holding district court has jurisdiction to review clear *ultra vires* agency action if no other remedy exists to vindicate plaintiffs' rights); *Investment Company Institute v. Board of Governors of the Federal Reserve System,* 551 F.2d 1270, 1280–1281 (D.C.Cir. 1977) (reviewing other remedies available to plaintiff where the harmful effects of agency action do not become apparent within 30 day statute of limitations). Indeed, plaintiff had ample opportunity to challenge the approval of the first appraisal, the Plan's clause which called for a possible increase in the number of shares to be issued, and the use of CRG as an appraiser within thirty days of publication of the Federal Register notice of this approval.

**3. Independence of the Appraiser.**

It is also alleged that the Offering Circular was fraudulent for stating that the value of

the stock would be based on an independent appraisal yet failed to reveal the corporate relationship between the appraiser, CRG, and Capital Resources, the underwriter for the conversion which had a financial stake in the success of the stock offering. (Complaint at ¶¶ 34–42, 51.)

OTS regulations specifically address the question of the independence of an appraiser in a conversion, however. Applications for conversion must conform to the requirements listed at 12 C.F.R. § 563b. 12 C.F.R. § 563b.3(b)(1) (1995).[18] Under these regulations, the converting institution must sell its stock at a total price equal to the estimated *pro forma* market value of the stock in the institution, "based on an independent valuation, as provided in § 563b.7." 12 C.F.R. § 563b.3(c)(1) (1995). The issue of the appraiser's independence is expressly governed by the regulations as follows:

> The [pricing] materials [for the conversion] shall be prepared by persons independent of the applicant, experienced and expert in the area of corporate appraisal, and acceptable to the [OTS]; ...

12 C.F.R. § 563b.7(f)(1)(i) (1995).

And further:

> [T]he applicant shall submit information demonstrating to the satisfaction of the [OTS] the independence and expertise of any person preparing materials under this paragraph. No appraiser shall serve as an underwriter or selling agent under the same plan of conversion. No affiliate of an appraiser may act as an underwriter or selling agent unless procedures are followed and representations made to ensure that an appraiser is separate from the underwriter or selling agent affiliate and

**17.** In order to allow the court of appeals to rule on the scope of its own jurisdiction with regard to this matter, *Investment Company Institute v. Board of Governors of the Federal Reserve System,* 551 F.2d 1270, 1280 (D.C.Cir.1977), the court does not express an opinion on the theory—not advanced by plaintiff to date—that the statute of limitations in this instance could be suspended based on the doctrine of equitable tolling because of the agency's failure to publish notice of the approval of the second appraisal. *See generally, Bowen v. City of New York,* 476 U.S. 467, 479–482, 106 S.Ct. 2022, 2029–2031, 90 L.Ed.2d 462

(1986); *Long v. Frank,* 22 F.3d 54, 58–59 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995); *Arneil v. Ramsey,* 550 F.2d 774, 781–782 (2nd Cir.1977).

**18.** In the instant case, the controlling section of the Code is 12 C.F.R. § 563b.7 (1995) because Carver sought OTS conditional approval for the conversion prior to seeking approval from its members for the transaction. (*See* Pollack Aff. Exh. 2 at 1, 4, 5.)

the underwriter or selling agent affiliate does not make recommendations or in any way impact the appraisal. No appraiser shall receive any other fee except for the fee for services rendered in connection with such appraisal.

12 C.F.R. § 563b.7(f)(2) (1995).

Thus, when approving a plan of conversion, the OTS is expressly required to pass on the exact question raised by the complaint when approving a plan of conversion. Moreover, as the regulation set forth above provides, special procedures must be followed where an appraiser and underwriter are in some way affiliated. For the reasons set forth in Section I, C, 1, *supra.*, a challenge such as this, which strikes at the heart of OTS decisionmaking authority and would require the district court to engage in a *de novo* review of the exercise of this authority, cannot be brought in the district court in the first instance. *Harr v. Prudential Fed. Sav. & Loan Ass'n,* 557 F.2d at 754. Here, plaintiff could have challenged the OTS's approval of the Plan with CRG as the appraiser in accordance with 12 U.S.C. § 1467a(j).

## II. JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS.

For the reasons set forth above, the federal claims in this action must be dismissed. Accordingly, the supplemental state law claims should also be dismissed as well. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Maric v. St. Agnes Hospital Corp.,* 65 F.3d 310, 314 (2d Cir.1995); 28 U.S.C. § 1367(c).

### CONCLUSION

For the reasons set forth above, the court lacks subject matter jurisdiction over that portion of the complaint alleging fraud in violation of the federal securities laws. Because of the dismissal of the federal claims, the state law claims must also fall. Accordingly, defendants' motions must therefore be granted and the complaint dismissed in its entirety.