Lawrence ORDOWER and Bruce
J. Goodhart, Petitioners,

v.

OFFICE OF THRIFT SUPERVISION,
et al., Respondents.

Lawrence ORDOWER and Bruce J.
Goodhart, Plaintiffs–Appellants,

v.

BELL FEDERAL SAVINGS AND
LOAN ASSOCIATION, et al.,
Defendants–Appellees.

Nos. 91–3816, 91–3832.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1992.

Decided July 27, 1993.

Robert A. Holstein, Aron D. Robinson, Jewel N. Klein (argued), Gregory A. Braun, Corey S. Berman, Holstein, Mack & Klein, Chicago, IL, for Lawrence Ordower and Bruce J. Goodhart.

Harris Weinstein, Aaron B. Kahn, Thomas J. Segal, Teresa A. Scott, Office of Thrift Supervision, Washington, DC, for Dept. of Treasury, amicus curiae.

Stuart Brafman, Office of Thrift Supervision, Chicago, IL, for Timothy Ryan.

Aaron B. Kahn, Laurie Romanowich (argued), Office of Thrift Supervision, Washington, DC, for Department of Treasury, Office of Thrift Supervision.

John C. Sciaccotta, Jill A. Dougherty (argued), James M. Rogan, Kelly, Olson, Rogan & Siepker, Chicago, IL, William Donnelly (argued), Joseph P. Daly, Muldoon, Murphy & Faucette, Washington, DC, for Bell Federal Sav. and Loan Ass'n, Bell Bancorp, Inc., Edmond M. Shanahan, Roland J. Barstow, Robert E. Ulbricht, John L. Vitale, C.P.A., Kenneth T. Wessner, Kenneth C. Wagner, C.P.A., Gunther H. Knoedler, Vernon Fryburger and Richard W. Hunzel.

Before CUMMINGS, COFFEY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

In 1991 Bell Federal Savings and Loan Association converted from mutual to stock form. The change required the approval of federal regulators and account holders. Two disgruntled depositors (jointly Ordower) ask us to set aside the order of the Office of Thrift Supervision approving the transaction. See 12 U.S.C. §§ 1464(i)(2)(B), 1467a(j), giving courts of appeals original and exclusive jurisdiction over such challenges. Ordower also filed suit in the district court, seeking damages and an injunction against the conversion. The district court dismissed that action for lack of jurisdiction in light of §§ 1464(i)(2)(B) and 1467a(j). We heard the appeal and petition for review in tandem.

**I**

The OTS has promulgated detailed regulations distinguishing acceptable from unacceptable conversions. 12 C.F.R. Part 563b. See also *Charter Federal Savings & Loan Association v. OTS*, 912 F.2d 1569, 1570–76 (11th Cir.1990) (discussing the history of these regulations). Bell applied for approval on September 12, 1991. The OTS twice asked for more information and induced Bell to change aspects of its proposals in order to conform to the rules. After the amendments, the OTS gave its approval on November 12, 1991, subject to certain conditions with which Bell has complied—and subject to the approval of Bell's depositors, a matter to which we return. The approval process is an informal adjudication under the Administrative Procedure Act; the judicial part is to ensure that

the agency does not act arbitrarily or capriciously. 5 U.S.C. § 706(2)(A). *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Charter Federal S & L,* 912 F.2d at 1579–80.

The mutual form of organization is an odd duck. Nominally the customers own the mutual, but it is ownership in name only. They cannot sell what they "own", and if they withdraw savings they receive only the nominal value of the account rather than a portion of the mutual's net worth, which is valuable to them only to the extent it permits the bank to pay higher interest. Lack of a firmly defined claim to the residual value leads many thoughtful people to conclude that mutuals are inefficient methods of organization and that it is appropriate to call the managers the real owners. See Eric Rasmusen, *Mutual Banks and Stock Banks,* 31 J.L. & Econ. 395 (1988); Eugene F. Fama & Michael C. Jensen, *Agency Problems and Residual Claims,* 26 J.L. & Econ. 327, 337–41 (1983). Increasing competition among financial institutions has led to pressure to replace the mutual form with a stock form that assigns ownership interests more explicitly and makes them transferable. See Lawrence J. White, *The S & L Debacle* 107 (1991) (showing a steady increase in the number of conversions).

When conversion occurs, what happens to the depositors' "ownership" interest? One way to deal with the interest would be to offer depositors preemptive rights to buy the shares at a low price. The discount would transfer the net worth to the existing customers while still providing an increase in working capital (one of the principal motives for conversion, and the reason why the S & Ls do not just give shares to their depositors). There are, however, two related problems with preemptive rights: first, many account holders will be financially unable or unwilling to make an additional investment in stock, and so will lose the bargain element of the offer; second, the people who will end up with the bargain element, whether other depositors in amounts disproportionate to their accounts, or the public in a general subscription, may have no entitlement to that bonan-

za. The OTS therefore requires the converting S & L to give the stock a price that equals the *pro forma* market value. 12 C.F.R. § 563b.3(c)(1). The OTS does not insist on identifying the precise market value, however, permitting the S & L to offer some bargain element to its account holders and other claimants. The stock of newly converted S & Ls regularly increases in price immediately after issue; the increase shows the amount of the bargain element, which account holders can capture if they buy the stock. The OTS requires the converting S & L to offer stock to its account holders ahead of the general public. 12 C.F.R. § 563b.3(c)(2). Existing account holders receive a second entitlement called a "liquidation account." 12 C.F.R. § 563b.3(f). Before conversion, the account holders can obtain a share of the institution's net worth only if the mutual liquidates. The "liquidation account" preserves this entitlement after the conversion. The S & L must keep the net worth at the time of conversion unencumbered and available for distribution to the pre-conversion account holders in the event of liquidation. As the accounts existing on the record date (at least 90 days before the mutual's board approves the conversion, 12 C.F.R. § 563b.3(c)(14)) are drawn down or closed, the liquidation account is correspondingly diminished. As the S & L holds greater amounts of new money (sums deposited after the conversion), the importance of the liquidation account diminishes and the stockholders own more of the net worth.

■ Ordower contends that Bell undervalued its net worth, and thus its stock, permitting strangers (and managers) to capture an excessive portion of the mutual's value. The OTS disagreed, and that conclusion is neither arbitrary nor capricious. Bell obtained an appraisal from HAS Associates, Inc.; the OTS induced Bell to set its stock price on the assumption that its true net worth was almost $50 million more than the middle of the range HAS originally determined—$187 million rather than $138.4 million. The only asset that Ordower says this procedure missed or undervalued is Bell's leasehold in its headquarters building. The lease, for a 14–story building in the business district of

Chicago, runs through 2103 at an annual rental of $74,000. Sub-market rental gives the leasehold a substantial value, which HAS put at $2.269 million. Ordower insists that the leasehold's value is closer to $25 million, but as the OTS points out the valuation of the leasehold is irrelevant. A low rental means that Bell shows higher operating profits, and these profits were taken into account in determining its net worth. A lease with a bargain-basement rental may be valued as a capital asset, or it may be valued indirectly by capitalizing the profit stream to which it gives rise, but it may not be counted twice.

■ According to Ordower, the evil of the inaccurate net worth is not so much that it produced a low price for the stock (depositors should be happy about the opportunity to buy at a bargain) but that the managers and employees scooped up much of this stock ahead of the depositors. How this injured depositors is unclear; as it turned out, the depositors did not purchase all of the stock allocated to them, so some was sold to the public at large. No matter. OTS permits a large S & L to allocate up to 25% of the stock for officers and directors, and another 10% for an employee stock ownership plan (ESOP). 12 C.F.R. § 563b.3(c)(7), (8). Bell established an ESOP that bought 8% of the stock and reserved another 13.5% for future issuance to officers, directors, and other employees: 4% for an Association Recognition and Retention Plan and 9.5% for stock options. Ordower depicts both the ESOP stock and the reserved shares as "gifts" to employees. The characterization is absurd, and the OTS did not exceed its powers in approving this aspect of the transaction. The ESOP paid cash for its shares, borrowing the money from a bank unrelated to Bell. The shares serve as security for the loan. No gift here, except to the extent of the original-issue discount in the stock. The shares reserved for the Association Recognition and Retention Plan are to be issued over a five-year period to employees, with distributions based on performance. A performance bonus paid in stock is no more a "gift" than is a bonus paid in cash—or for that matter a salary. The stock options, which may not be exercised for five years (and then only if the person holding the option remains in Bell's employ), are likewise a form of compensation for services rendered, a substitute for cash with the benefit of linking the employees' welfare to the success of their firm. Aligning the interests of managers and investors is a much-sought goal of corporate organization. Long ago courts concluded that options to purchase stock at a bargain price do not waste a firm's assets. E.g., *Beard v. Elster*, 39 Del.Ch. 153, 160 A.2d 731 (Sup.Ct.1960); see also *Cohen v. Ayers*, 596 F.2d 733, 739–40 (7th Cir.1979). OTS's approval of a conversion plan that included stock options is no more objectionable.

■ According to Ordower, the OTS's decision is flawed in three other respects: the proxies that Bell voted to approve its request for conversion were defective because they could be revoked only in writing; the plan discriminated against new depositors by setting a record date more than 90 days before the conversion; and the OTS failed to reply to his letters objecting to Bell's submission. We can be brief. (1) The regulations require all proxies to be revocable. 12 C.F.R. § 569.2(a). Bell's proxies were revocable. That Bell required revocation to be in writing was simple prudence, avoiding the sort of disputes that claims of oral revocation could produce. (2) The record date is set 90 or more days before the proposal to convert not only to establish a known group of depositors entitled to vote but also to prevent persons who get wind of the plan from granting themselves priority in the purchase of stock by enlarging their accounts or opening new ones. An early record date, in other words, prevents the dilution of the long-time depositors' ownership interest. The OTS did not act capriciously in approving Bell's proposed record date. (3) Ordower's letters were untimely under 12 C.F.R. § 563b.4(b) because not received within ten business days following public notice of the conversion. The OTS did not need to enter into a dialog with Ordower's lawyer.

■ Having concluded that the OTS did not act arbitrarily in evaluating and approving Bell's proposal, we come to what Ordower casts as his principal contention: that by

approving the conversion, the OTS "took" his property without just compensation. Ordower also contends that the regulations violate the due process clause by permitting the S & L to convert without notice to depositors and that Congress unconstitutionally delegated its legislative powers to the OTS. Individually and collectively these arguments are hollow, suggesting that Ordower was trying to hold up the conversion in hopes of being bought off. He failed in that attempt when the conversion went forward, and his constitutional arguments require but brief comment.

■ The OTS did not "take" any property. It approved a proposal made by a private entity. A regulator's failure to prohibit a privately initiated and implemented transaction does not violate the Constitution. Cf. *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Ordower might have a glimmer of a claim if the OTS had instructed Bell to reduce the price at which it sold stock or compelled Bell to increase the stock allocated to management—although even then it is hard to conceive of the intervention as a tort, see *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), let alone as a violation of the Constitution—but the OTS did neither. It impelled Bell to move entirely in the direction Ordower favors. A depositor's interest in a mutual S & L is a liquidation preference, not a transferable property right. *Paulsen v. CIR,* 469 U.S. 131, 138, 105 S.Ct. 627, 631, 83 L.Ed.2d 540 (1985); *Society for Savings in the City of Cleveland v. Bowers,* 349 U.S. 143, 150, 75 S.Ct. 607, 610, 99 L.Ed. 950 (1955); *York v. Federal Home Loan Bank Board,* 624 F.2d 495, 499–500 (4th Cir. 1980). Bell was not about to liquidate, and the depositors could not force it to do so. Still, the OTS preserved depositors' liquidation preference through the "liquidation account" it required Bell to establish.

■ As for due process: the procedure by which Bell obtained its depositors' approval for making the initial request to the OTS was not governmental action. That Bell holds a federal charter no more subjects its acts to the due process clause than the fact that most corporations hold charters from states makes their deeds "state action." Corporations usually implement mergers, going-private transactions, and other changes of form in two stages: the board of directors approves the transaction, which is submitted to the shareholders for approval. Bell sought its depositors' approval *twice:* once before submitting the proposal and once after the OTS approved. The first of these—the one Ordower says violated the due process clause—entailed depositors' approval in name only. The board voted proxies that it had solicited when the depositors opened their accounts. Let us suppose this means that the depositors didn't "really" approve. So what? Bell is not a part of the national government, and there was a "real" vote later, tracking the pattern of other corporate reorganizations.

Finally there is the claim of unconstitutional delegation, on which Ordower cites *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), and other fossils. It has been a long time since the Supreme Court found a delegation to the executive branch excessive. In *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), the Court sustained a statute delegating to banking regulators the power to appoint conservators for federal financial institutions. See also *E.I. du Pont de Nemours & Co. v. Collins,* 432 U.S. 46, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1977) (SEC's power to approve holding company conversion); *Arcadia v. Ohio Power Co.,* 498 U.S. 73, 111 S.Ct. 415, 112 L.Ed.2d 374 (1990) (SEC and FERC powers in holding company reorganizations). The statute under which the OTS exercises its regulatory powers, 12 U.S.C. § 1464(i), is no worse than ordinary and better than many. As the eleventh circuit explained in *Charter Federal S & L,* Congress has devoted substantial attention to the rules for mutual-to-stock conversion, altering them frequently; it is impossible to conclude that the OTS is off on a lark, lacking guidance from the legislature.

## II

Ordower asked the district court to enjoin the conversion and award damages. The district judge dismissed the action for want of jurisdiction, observing that the court of appeals has exclusive jurisdiction to review the OTS decision. To the extent Ordower was attacking the substance of the transaction, this decision is unexceptionable. *Harr v. Prudential Federal Savings & Loan Ass'n*, 557 F.2d 751, 753–54 (10th Cir.1977). When Congress places review of an administrative decision in the court of appeals, district judges may not enjoin or penalize action that the agency has approved or that is the natural outcome of the agency's decision. *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984); *Whitney National Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965).

Repackaging the challenge as one under federal common law for breach of fiduciary duty adds nothing. Whatever duties bank managers have are enforced by the OTS subject to review in the court of appeals. *Barany v. Buller*, 670 F.2d 726, 735 (7th Cir.1982), on which Ordower principally relies, offers him no aid. *Barany* holds that district courts may administer federal common law in banking cases "[t]o the extent that federal regulations and the federal statute [do] not govern the matter at issue". As we explained in Part I, federal regulations do govern all of the substantive objections Ordower raises.

Over one aspect of the process, however, the district court possesses original jurisdiction. The OTS did not *compel* Bell to convert to stock form. Instead it approved management's proposal to convert, subject to the depositors' approbation. Management proposes, the OTS and depositors dispose. Bell mailed out fresh proxy materials on November 16, 1991, after which depositors voted overwhelmingly in favor of the conversion. Approximately 7% of the votes were cast against. The OTS does not review the accuracy of materials by which management solicits the depositors' approval. 12 C.F.R. § 563b.5(g)(2) ("The fact that a proxy statement . . . has been filed with or examined by

the Office and authorized for use shall not be deemed a finding by the Office that such material is accurate or complete or not false or misleading, or that the Office has passed upon the merits of or approved any proposal contained therein.") Similarly the SEC looks over corporate proxy materials without approving them. Defects in these materials may be challenged in a district court even though the court of appeals is the exclusive forum for review of the SEC's decisions. See *Virginia Bankshares, Inc. v. Sandberg*, —— U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991); *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The tenth circuit assumed in *Harr* that an action challenging the electioneering and proxy materials for bank conversions is equally appropriate, 557 F.2d at 752–53, and we agree. That the OTS has found the substance of a transaction in compliance with federal law—which is all the OTS's approval establishes—does not relieve the bank's managers of the duty to tell the truth when asking the depositors to approve the transaction. The depositors are free to turn down the managers' proposal. A district court accordingly may consider whether the materials describing the transaction and soliciting that approval were complete and accurate.

The order of the OTS is enforced. The judgment of the district court is vacated, and the case is remanded with instructions to determine whether the proxy materials complied with the requirements of federal law and, if not, to fashion an appropriate remedy. In conducting this review, the court must assume that the conversion complies with all substantive requirements of federal law. Cf. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Ordower may not wage a collateral attack on the valuation approved by the OTS by describing the repetition of that valuation in the proxy materials as a form of fraud or deceit. The district court must remove from the case the kinds of arguments we have covered in Part I. It may be that with direct and disguised substantive objections deleted nothing will be left, but the district court should address this in the first instance. Subject to the limitations we have described,

the depositors are entitled to a decision on their challenge to the accuracy of the proxy materials.