112 F.3d 613
 Robert L. DOUGHERTY, on his own behalf and on behalf of all
those similarly situated; Norman Gomberg; Joseph
Uminer, Plaintiffs-Appellants,
v.
CARVER FEDERAL SAVINGS BANK; Capital Resources, Inc.;
Capital Resources Group, Inc.; Richard T. Greene; M. Moran
Weston; David R. Jones; Benjamin W. Watkins; Herman
Johnson; Biswarup Mukherjee; Howard R. Dabney; Margaret
R. Lewis, Defendants-Appellees.
 No. 110, Docket 96-7131.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 4, 1996.
Submitted Nov. 14, 1996.
Decided April 30, 1997.
 
 Richard A. Finberg, Pittsburgh, Pennsylvania (Eric T. Smith, Malakoff Doyle & Finberg, Pittsburgh, Pennsylvania; Bruce E. Gerstein, Barry S. Taus, Garwin, Bronzaft, Gerstein & Fisher, New York City; James E. Bauman, Mallery & Zimmerman, Milwaukee, Wisconsin, of counsel), for Plaintiffs-Appellants.
 Daniel A. Pollack, New York City (Martin I. Kaminsky, Edward T. McDermott, Raymond L. Bruce, Pollack & Kaminsky, New York City; Clark R. Silcox, Steele, Silcox & Browning, Washington, DC, of counsel), for Defendants-Appellees.
 Richard H. Walker, Washington, DC (Jacob H. Stillman, Susan S. McDonald, Angel Yang, Paul Gonson, Securities and Exchange Commission, Washington, DC, of counsel), submitted a brief on behalf of The Securities and Exchange Commission as Amicus Curiae.
 Aaron B. Kahn, Washington, DC (Carolyn J. Buck, Thomas J. Segal, Office of Thrift Supervision, Washington, DC, of counsel), submitted a letter brief on behalf of The Office of Thrift Supervision as Amicus Curiae.
 Before: FEINBERG, CARDAMONE, and McLAUGHLIN Circuit Judges.
 CARDAMONE, Circuit Judge.
 
 
 1
 This appeal arises out of the conversion by defendant Carver Federal Savings Bank (Carver or Bank) from the mutual to the stock form of ownership in the fall of 1994. In connection with that transaction, Carver issued 2,314,375 shares of common stock to investors at a price of $10 per share. Plaintiffs Robert L. Dougherty, Joseph Uminer and Norman Gomberg each subscribed for and purchased Carver stock at the $10 price, purchasing respectively $150,000, $86,800 and $350,300 worth of Carver stock, only to see the stock lose a substantial portion of its value in the first week of public trading.
 
 
 2
 Plaintiffs then brought separate securities fraud class actions in the United States District Court for the Southern District of New York (Motley, J.) alleging that the offering circular used by Carver to sell its stock contained material misstatements and omissions in violation of federal and state securities laws. Because the Office of Thrift Supervision (OTS) approved Carver's application to convert to stock form, the district court, relying on 12 U.S.C. § 1464(i)(2)(B), which designates the Court of Appeals as the exclusive forum for judicial review of final OTS conversion approvals, dismissed the plaintiffs' claims for lack of subject matter jurisdiction in an opinion reported at 909 F.Supp. 197 (1996). OTS approval of Carver's conversion from mutual form to stock form did not decide the issues raised by plaintiffs' securities fraud claims. Hence, we reverse.
 
 BACKGROUND
 
 3
 A. Legislative Enactments and Regulatory Framework for Conversion in Savings and Loan Industry
 
 
 4
 To put this case in proper perspective, it is helpful to discuss briefly at the outset the conversion process in general and the manner in which the regulatory framework governing such conversions has evolved.
 
 
 5
 1. Conversion Process in General. Federal savings associations come in two forms--mutual associations and stock associations. Mutual associations differ from ordinary stock corporations in that they have no stock or shareholders, but instead are operated for the mutual benefit of their depositors, who elect the board of directors. Stock savings associations, in contrast, are like ordinary stock corporations--they are owned and controlled by persons holding their stock. See Ordower v. Office of Thrift Supervision, 999 F.2d 1183, 1185 (7th Cir.1993) (discussing mutual form of ownership); Charter Fed. Savings & Loan Ass'n v. Office of Thrift Supervision, 912 F.2d 1569, 1570 (11th Cir.1990) (same). The present action arises from defendant Carver's decision to convert from mutual form to stock form. In a conversion of this sort, a mutual association exchanges its mutual charter for a stock charter and issues stock to investors, who then become the owners of the association.
 
 
 6
 2. Evolution of the Regulatory Framework. The regulatory and legislative environment for such conversions has varied over the years. Initially, all federal savings associations were in mutual form. When Congress first enacted the Home Owners' Loan Act of 1933 (HOLA), 12 U.S.C. § 1461 et seq., permitting the formation of federal savings associations, it provided for only one form of charter--the mutual charter--and provided no mechanism for converting to stock form. This changed in 1948, when the legislature amended HOLA to permit federal mutual associations to convert to state stock associations. See Charter Fed. Savings & Loan Ass'n, 912 F.2d at 1571.
 
 
 7
 The initial experience with conversions raised troubling problems. In this initial period, the question of who owned the net worth that had been accumulated over years and how to dispose of it in a conversion to a stock corporation was not well regulated. There was great temptation to raid the billions of dollars in industry accumulation of net worth. In fact, an independent study commissioned by Congress revealed that in the majority of pre-1963 conversions, the group of insiders initiating the conversion appropriated "a large part" of the net worth. S.Rep. No. 93-902 (1974) (additional views of Sen. William Proxmire), reprinted in 1974 U.S.C.C.A.N. 6136, 6137. As a result a moratorium was placed on conversions in 1963.
 
 
 8
 A decade later, Congress began to lift the ban, which was completely eliminated in 1976. See Charter Fed. Savings & Loan Ass'n, 912 F.2d at 1571. Conversions resumed under a new set of comprehensive regulations adopted by the Federal Home Loan Bank Board. Initially, concerned with insider abuse, federal regulators were wary of conversions. As time went on these officials became increasingly attracted to the procedure as a means for shoring up the capital position of undercapitalized savings associations. This trend became more pronounced with the advent of the savings and loan crisis of the late 1970s and early 1980s. Faced with the prospect of widespread savings association failures, federal regulators loosened the conversion regulations to make it easier and more attractive for banks to take advantage of the procedure to raise capital. See Conversions From Mutual to Stock Form, 59 Fed.Reg. 22,725, 22,725-26 (1994) (to be codified at 12 C.F.R. pts. 563b & 575) (interim final rule with request for comments, May 3, 1994) (discussing evolution of regulatory environment) [hereafter Proposed 1994 Regulations ].
 
 
 9
 In this environment, conversions became very popular. Over 300 federal savings institutions converted between 1990 and 1994, raising nearly $5 billion in the process, see Mutual Depository Institution Conversion Protection Act of 1994: Hearings on S. 1801 Before the Senate Comm. on Banking, Housing and Urban Affairs, 103 Cong. (1994) (statement of Jonathan L. Fiechter, Acting Director, Office of Thrift Supervision), and in the decade between 1984 and 1994, the number of savings associations in mutual form nationwide dropped by roughly 56 percent. See Mutual-to-Stock Conversions of State Nonmember Savings Banks, 59 Fed.Reg. 30,357 (1994) (FDIC notice and request for comments) (noting decrease to 1,100 mutual associations in 1994 from more than 2,500 in 1984).
 
 
 10
 Eventually, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, 103 Stat. 183 (1989), which restructured the regulation of the savings association industry by, inter alia, abolishing the Federal Home Loan Bank Board (Bank Board) and vesting many of its functions in the newly-created Office of Thrift Supervision, see FIRREA § 301 (establishing OTS), § 401 (abolishing Bank Board). With time, the thrift under-capitalization problem abated and the industry returned to solvency. With the crisis past, the OTS, concerned anew with insider abuses, tightened its conversion procedures through interim final rules issued in May 1994, see Proposed 1994 Regulations, supra, 59 Fed.Reg. at 22,725. Those rules were adopted in final form in November 1994. See Conversions from Mutual to Stock Form, 59 Fed.Reg. 61,247 (1994) (to be codified at 12 C.F.R. pts. 563b & 575) (final rule, Nov. 30, 1994). Carver's conversion to stock form took place in the midst of this regulatory rule-tightening, but was completed before the adoption of the final rule.
 
 B. The Carver Federal Savings Conversion
 
 11
 In early 1994, defendant Carver was one of the largest African-American owned financial institutions in the United States, but had not yet converted from mutual to stock form. Although the mutual form of ownership has certain advantages--among other things, it offers near-complete takeover protection--Carver, like many other mutual banks, decided to convert to stock form to raise capital by selling its stock to investors. Converting to stock form allows a savings bank to operate in a more traditional manner, provides the capital necessary to acquire branches more readily and strengthens the bank's ability to recruit and retain quality managers using stock-based incentives such as employee stock option plans. See C. Thomas Long et al., Conversions and Securities Offerings of Savings and Loan Associations, C418 ALI-ABA 411, 421-422 (1989) (discussing advantages and disadvantages of converting to stock form).
 
 
 12
 As a federally-chartered savings bank, Carver could not convert from mutual to stock form without securing the prior written approval of the OTS. Under the OTS regulations in effect in 1994, a mutual savings association seeking such approval was required to submit an application to the OTS containing the formal written plan of conversion, a draft proxy statement, a preliminary form of the offering circular to be used to sell the stock issued upon conversion, and information relating to the valuation of the stock to be issued. See 12 C.F.R. § 563b.100 (1994) (conversion application). To assist in the valuation of the stock, OTS regulations further required the bank to obtain an appraisal of the bank's market value, prepared by "persons independent of the applicant." § 563b.7(f). On June 21, 1994 Carver's Board of Directors unanimously approved a plan of conversion. To assist in implementing the plan, the Bank hired defendant Capital Resources, Inc. as "financial consultant and sales agent."
 
 
 13
 In July 1994 Carver submitted its conversion application to the OTS, which subsequently advised Carver to publish a notice of the filing of the application pursuant to 12 C.F.R. § 563b.4(b)(1). Written comments, including objections to the plan of conversion, had to be submitted to the OTS within 10 business days after publication of this notice. § 563b.4(b)(1) (1994). The application thus submitted, OTS began its review of the matter and could either approve or reject the plan. This determination is made in a non-judicial capacity--the regulations make no provision for an evidentiary hearing, or any other opportunity to present witnesses. If the plan were approved, the bank would then make a subscription offering to members of the association, selling any securities remaining to the public in the community and then elsewhere. § 563b.3(c)(6) (1994).
 
 
 14
 In anticipation of the eventual subscription offering, Carver prepared an offering circular relating to the stock that would be sold under the conversion. Under OTS regulations, the capital stock issued upon a conversion cannot be issued and sold "except by means of a final offering circular ... declared effective by the [OTS]." § 563b.7(a)(3) (1994). As a savings association, Carver was exempt from the registration requirements of the Securities Act of 1933, and thus was not required to register its capital stock with the Securities and Exchange Commission. See 15 U.S.C. § 77c(a)(5)(A) (exempting "[a]ny security issued by a savings and loan association....").
 
 
 15
 The centerpiece of a mutual-to-stock conversion is the issue and sale of the converted institution's capital stock to investors and, as one might expect, a key feature of any conversion plan is the price at which that capital stock will be offered. OTS regulations require a converting institution to "issue and sell its capital stock at a total price equal to the estimated pro forma market value of such stock in the converted savings association." § 563b.3(c)(1) (1994). To determine what this estimated value should be, OTS regulations direct the issuer to obtain an appraisal performed by a party "independent of the applicant, experienced and expert in the area of corporate appraisal, and acceptable to the [OTS]." § 563b.7(f)(1)(i) (1994). Although OTS regulations have since been amended to restrict the use of underwriters who will be selling the stock and their affiliates to serve as conversion appraisers, the regulations in effect at the time of Carver's conversion had no such restrictions. Compare § 563b.7(f)(2) (1996) ("No affiliate of an appraiser may act as an underwriter or selling agent unless procedures are followed and representations made to ensure that an appraiser is separate from the underwriter or selling agent affiliate and the underwriter or selling agent affiliate does not make recommendations or in any way impact the appraisal.") with § 563b.7(f)(2) (1994) ("A [party] will not be considered as lacking independence for the reason that such [party] will participate in effecting a sale of capital stock under the plan of conversion...."). Carver accordingly was free to hire Capital Resources Group, Inc.--a direct affiliate of Capital Resources, the sales agent for the transaction--as the "independent" appraiser.
 
 
 16
 Despite the potential conflict of interest in allowing the deal underwriter or its affiliate to act as the conversion appraiser, Carver's offering circular did not disclose to potential investors the relationship between Capital Resources Group and Capital Resources. Instead, the offering circular referred to Carver's appraiser, without qualification, as "independent" and advised potential investors that the aggregate offering price of Carver's stock would be based upon an "independent appraisal."
 
 
 17
 Capital Resources Group performed two appraisals for Carver--an initial appraisal and an updated one. The first appraisal, completed on June 24, 1994, resulted in an estimated pro forma market value of the stock to be sold of $17,500,000. In accordance with OTS regulations, see § 563b.7(c) (1994), the Bank used this value to establish an "estimated price range" within 15 percent above or below the estimated market value, that is, a range from $14,875,000 to $20,125,000. This price range was set forth in the offering circular, and investors were given the opportunity to subscribe for Carver stock based on it.
 
 
 18
 OTS guidelines require the issuer to obtain an updated appraisal at the close of the offering period and to set the final offering price accordingly. Federal Home Loan Bank Board, Guidelines for Appraisal Reports for the Valuation of Savings and Loan Associations and Savings Banks Converting from Mutual to Stock Form of Organization 8-9 (rev. ed. Oct.1983) (hereafter Appraisal Guidelines ). Carver's offering circular contemplated this updated appraisal and estimated that the final appraisal might, with OTS approval, exceed the upper limit of the estimated price range by as much as 15 percent--in that event, the offering circular provided that the "total maximum [offering price], as adjusted" would be $23,143,750. Under the terms of the offering, subscribers would not be given an opportunity to revoke their orders unless the final aggregate offering price was less than $14,875,000 or more than $23,143,750. At a per share price of $10, this meant that Carver could issue between 1,487,500 and 2,314,375 shares without a resolicitation.
 
 
 19
 Despite the breadth of the permitted range, Carver was not empowered simply to set the final aggregate offering price wherever it saw fit. Although the price was "subject to change due to changing market conditions and other factors," the offering circular expressly provided that the final aggregate offering price would be "consistent with an independent appraisal of the estimated pro forma market value of the Common Stock following the Conversion." Moreover, the offering circular provided that promptly after completion of the sale of all of the stock, the appraiser would confirm that, "to the best of its knowledge and judgment, nothing of a material nature ha[d] occurred ... that would cause it to conclude that the aggregate dollar amount of shares ordered in the Conversion was incompatible with its estimate of the pro forma market value...." If Capital Resources Group could not make that certification, orders to purchase stock could be cancelled and a resolicitation would be held.
 
 
 20
 On August 12, 1994 the OTS approved the conversion application, and on August 15, 1994 it cleared Carver's offering circular. Notice of the August 12 approval was published in the Federal Register on August 23, 1994. See 59 Fed.Reg. 43,380 (1994). Carver distributed the offering circular to its members and received a strong response. At the close of the subscription period on September 22, 1994, the offering was oversubscribed. Thereafter, as provided in the offering circular, Capital Resources Group performed an updated appraisal. That appraisal, dated September 23, 1994, increased the estimated pro forma market value to the maximum amount possible without requiring a resolicitation of subscribers--$23,143,750. The updated appraisal was submitted to and approved by the OTS on October 4, 1994. On October 24, 1994 Carver converted to stock form and issued 2,314,375 shares of common stock at $10 per share.
 
 
 21
 Carver's stock opened for trading on NASDAQ under the symbol "CARV" on October 25, 1994. By the end of the first day of trading, the price had plummeted over 23 percent from the initial $10 price--it closed at $7.66 per share. The stock price continued its downward spiral, and by mid-March 1995, it had fallen to $6.625--nearly 34 percent below its subscription price.
 
 C. Proceedings in the District Court
 
 22
 On April 5, 1995 plaintiff Robert L. Dougherty filed a class-action complaint in the Southern District of New York seeking to recover losses allegedly sustained as a result of misrepresentations and omissions in the offering circular. The complaint named Carver, Capital Resources, Capital Resources Group, and certain of Carver's directors and officers as defendants. Plaintiffs Norman Gomberg and Joseph Uminer filed separate class-action complaints containing similar allegations on July 6, 1995 and October 24, 1995 respectively, and the three complaints were consolidated.
 
 
 23
 Each of the complaints alleges that the offering circular was misleading in that (1) it represented that the number of shares to be issued in the offering would be based upon an independent valuation, yet it omitted to disclose the nature of Capital Resources Group's affiliation with Capital Resources; (2) it represented that Capital Resources Group's initial appraisal was reliable when in fact defendants knew or should have known that it was not; (3) it represented that the updated appraisal would be increased only if "changing market conditions and other factors" warranted such increase when in fact the defendants knew or should have known that the offering would be increased by 15 percent regardless of market conditions; and (4) it failed to disclose the degree to which the bank was subject to losses in the event of a rise in interest rates due to the percentage of mortgage-backed securities in its portfolio. Norman Gomberg's complaint alleges, in addition, that certain favored depositors were allowed to rescind their subscription orders despite the representation in the offering circular that such subscriptions once made could not be rescinded.
 
 
 24
 The plaintiffs' complaints sought recovery for losses allegedly sustained when the value of Carver's stock fell dramatically from the offering price upon the advent of its public trading. The complaints do not name the OTS as a party defendant, nor do they seek to modify or overturn OTS approval of the conversion, or allege that any OTS regulation was violated.
 
 
 25
 The defendants moved under Fed.R.Civ.P. 12(b)(1) to dismiss the complaints for lack of subject matter jurisdiction, arguing that the plaintiffs' claims, although couched in terms of securities fraud, were in reality nothing but attacks on the OTS's approval of the conversion application. Because judicial review of OTS conversion decisions may only be obtained in the courts of appeals, the defendants reasoned that the district court could not hear the case.
 
 
 26
 The district court agreed, concluding that the allegations of the complaints were nothing but a "thinly veiled collateral attack on OTS actions." 909 F.Supp. at 198. Accordingly, it dismissed the claims for lack of subject matter jurisdiction.
 
 
 27
 This appeal followed. After oral argument, the panel requested amicus briefs from the OTS and the Securities Exchange Commission. Those helpful briefs have now been filed with the Court.
 
 DISCUSSION
 
 28
 I District Court Jurisdiction Over Securities Fraud Claims Arising Out of a Conversion
 
 
 29
 Because of the regulatory controls imposed on savings institutions by banking legislation and the jurisdiction exercised over such institutions by bank regulatory agencies like the OTS, Congress has expressly exempted securities issued by savings and loan banks from registration with the SEC as a condition to their offer and sale under the Securities Act of 1933. See 15 U.S.C. § 77c(a)(5)(A). Carver was thus not required to register the stock issued in its conversion with the SEC. However, Carver's stock is not exempt from the securities law antifraud provisions, including § 12(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), and § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. See Tcherepnin v. Knight, 389 U.S. 332, 340-41, 88 S.Ct. 548, 555-56, 19 L.Ed.2d 564 (1967); see also §§ 12(2) and 17(c) of the Securities Act, 15 U.S.C. §§ 77l(a)(2), 77q(c) (expressly including these exempted securities within antifraud coverage). Savings association spokesmen appearing before Congress in the 1930s "emphatically endorsed the coverage of [savings] associations under the ... antifraud provisions," Tcherepnin, 389 U.S. at 340, 88 S.Ct. at 555, and when it enacted the Exchange Act, Congress intended the antifraud provisions to act as a "shield" to protect savings association investors against "unscrupulous or unqualified promoters," id. at 345-46, 88 S.Ct. at 558.
 
 
 30
 Stock issued pursuant to a mutual bank's conversion to a stock corporation is no exception. Nothing in the statutory scheme governing mutual savings bank conversions divests a district court's jurisdiction under the securities laws for claims alleging fraud in a converting bank's sale of its stock.
 
 
 31
 The statute relied on by the district court in dismissing the action for lack of subject matter jurisdiction, 12 U.S.C. § 1464(i)(2)(B), designates the court of appeals as the exclusive forum for judicial review of "final action[s] of the Director [of OTS] which approve[ ] or disapprove[ ] a plan of conversion," and requires that a party seeking to modify, terminate or set aside such an action file a petition within 30 days of publication of notice of such action in the Federal Register. 12 U.S.C. §§ 1464(i)(2)(B), 1467a(j). In its most typical application, this provision is used to ensure that actions directly challenging the conversion approval--by naming the OTS as defendant and seeking to enjoin or set aside a conversion--are brought exclusively in the court of appeals in the circuit where the bank is located.
 
 
 32
 As the district court acknowledged, this statute was not intended to deny investors purchasing stock pursuant to a conversion the protections of the securities laws. The statute does not purport on its face to affect--let alone extinguish--securities fraud claims. Nor have we found anything in the legislative history to suggest that by enacting this provision, Congress sought to relieve converting federal savings associations of the general obligation to offer and sell securities honestly. See Rembold v. Pacific First Fed. Sav. Bank, 798 F.2d 1307, 1310 (9th Cir.1986) (noting no intent to repeal securities laws protection in legislative history); see also 12 U.S.C. § 1467a(k) (conversion provisions not intended to approve any conduct previously prohibited by law). Simply put, OTS approval of a conversion does not lift from the shoulders of the bank, its managers and agents the obligation to conduct the sale of its stock in an honest and straightforward manner so that investors are not mislead. See Ordower, 999 F.2d at 1188.
 
 
 33
 However, because every conversion involves the preparation of an offering circular and a proxy statement, there is a danger that some litigants seeking review of the OTS decision to approve or disapprove the plan of conversion will recast the allegations in their complaints to assert securities fraud claims in order to circumvent the exclusive review provisions contained in the conversion statute. To prevent this end-run around § 1464(i)(2)(B), other circuits have cautioned trial courts to review carefully the substance of securities fraud causes of action allegedly arising out of a conversion in order to ensure that by means of artful pleading litigants do not obtain prohibited district court review of an OTS conversion approval. Ordower, 999 F.2d at 1188 (instructing district court on remand to ensure that securities fraud claims in complaint did not amount to "collateral attack" on decision of the OTS); Craft v. Florida Fed. Sav. & Loan Ass'n, 786 F.2d 1546, 1553-54 (11th Cir.1986) (plaintiffs could not use "bare bones allegations [of securities fraud] made to escape the exclusive review provisions"); Harr v. Prudential Fed. Sav. & Loan Ass'n, 557 F.2d 751, 754 (10th Cir.1977) (litigants could not circumvent exclusive review provisions of statute by putting "a Rule 10b-5 gloss" on their attacks on the agency decision).
 
 
 34
 In light of these possible attempts to avoid exclusive review in the circuit courts, a district court must carefully sift the allegations of a securities fraud cause of action arising out of a conversion to identify those claims that seek to evade the exclusive review provisions. Where Congress has vested exclusive review of agency action in the court of appeals, a district court cannot enjoin actions that are the natural outcome of the agency's decision. FCC v. ITT World Communications, Inc., 466 U.S. 463, 468, 104 S.Ct. 1936, 1939-40, 80 L.Ed.2d 480 (1984). Yet, in examining a complaint, great care must be taken not to "throw the baby out with the bathwater," lest the district court dismiss viable securities fraud causes of action that do not truly seek to set aside or circumvent an OTS conversion decision. Defendants, as well as plaintiffs, must be presumed to be skilled in the craft of artful pleading, and if care is not taken, clever defendants will quickly learn how to characterize properly pleaded securities fraud claims as "disguised collateral attacks," to circumvent liability that may be imposed on them by the antifraud statutes.
 
 
 35
 Thus, in deciding a motion to dismiss for lack of subject matter jurisdiction in reliance on 12 U.S.C. § 1464(i)(2)(B), attention must be focused on what issues the agency has actually decided. Subject matter jurisdiction to decide an issue raised in a securities fraud lawsuit arising out of a mutual-to-stock conversion is lacking in the district court only when (1) the OTS, acting within its authority, has actually considered and decided the same issue, and (2) the resolution of that issue is essential to the agency's decision to approve or disapprove the conversion. See Haerum v. Air Line Pilots Ass'n, 892 F.2d 216, 220 (2d Cir.1989) (collateral estoppel principles applied to question of whether agency, whose decisions are reviewable only in the court of appeals, actually decided an issue). If the OTS has not decided the issue raised in the complaint or if its decision was not essential to the OTS's final order approving or disapproving the conversion, the district court does not by entertaining jurisdiction engage in "review of a final action of the Director," 12 U.S.C. § 1464(i)(2)(B), and that statute, by its terms, is inapplicable.
 
 
 36
 The difficulty arises when there are elements of an attack on the conversion process and fraud claims mingled together in one lawsuit. The threshold question to be resolved in each case--before facing the merits--is where does suit properly belong? We think the decisional law provides an analytical framework to resolve that threshold question, one within which this case fits. We begin with Harr v. Prudential Fed. Sav. & Loan Ass'n, decided 20 years ago. It was assumed by the Tenth Circuit that private remedies for fraud exist under Bank Regulations. 557 F.2d at 752-53. But, the gravamen of the complaint in Harr attacked the plan of conversion itself, one that had been approved by the Bank Board. Id. at 753-54. The court thus held that the district court lacked jurisdiction over the matter. In Craft v. Florida Fed. Sav. & Loan Ass'n, the Eleventh Circuit similarly concluded that when a complaint is directed at matters that are "part and parcel" of the conversion plan approved by the Bank Board exclusive jurisdiction is in the court of appeals, not in the district court, which had assumed jurisdiction. 786 F.2d at 1552. In reversing, it viewed plaintiffs' fraud claims, which failed to allege any false or misleading statements, as "bare bones allegations" designed to escape the court of appeals' exclusive review. Id. at 1554.
 
 
 37
 In contrast, the Ninth Circuit in Rembold v. Pacific First Fed. Sav. Bank, stated that the exclusive review statute did not oust district court subject matter jurisdiction over a stockholder's private cause of action based on fraud in a stock offering circular. Plaintiffs claimed to suffer monetary loses because they purchased stock in reliance on alleged misrepresentations. 798 F.2d at 1312. Despite Bank Board approval of a conversion plan, the court reasoned that the district court had jurisdiction over the suit because the Bank Board does not review the accuracy or adequacy of such materials. Id. at 1311. Similarly, because the OTS does not review the accuracy of the proxy materials through which management of a converting mutual bank solicits its depositors' approval, the Seventh Circuit stated in Ordower v. OTS, 999 F.2d at 1188, that defects in those materials are properly challenged in district court, despite the exclusive review provisions of 12 U.S.C. § 1464(i)(2)(B). Finally, in Reschini v. First Fed. Sav. & Loan Ass'n of Indiana, 46 F.3d 246 (3d Cir.1995), the Third Circuit agreed with Ordower that the exclusive review provisions do not apply to causes of action grounded on materially false or misleading proxy materials. Id. at 253.
 
 
 38
 We glean from these cases that securities fraud claims alleging misstatements or omissions in offering materials should rarely divest the district court of subject matter jurisdiction under the conversion statute's exclusive review provisions because the OTS does not pass upon the adequacy or accuracy of offering materials when giving its approval. 12 C.F.R. § 563b.7(d) (1994). Although the agency reviews each offering circular and prohibits sales before the offering circular has been declared effective, 12 C.F.R. § 563b.7(a)(3) (1994), ultimate responsibility for the adequacy and accuracy of disclosure rests with the issuer, and this burden cannot be shifted to the OTS staff.
 
 
 39
 Although the OTS reviews disclosure materials and will alert an issuer if obvious errors or inadequacies are discovered in the review process, the agency cannot and does not vouch for the adequacy or accuracy of the underlying data contained in such documents. Ordower, 999 F.2d at 1188; cf. J.I. Case Co. v. Borak, 377 U.S. 426, 432-33, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964) (noting similar considerations with regard to SEC review of disclosure documents). To ensure that investors do not misinterpret the order approving the plan of conversion to constitute approval of the adequacy and accuracy of the offering materials, the OTS prohibits issuers from making representations to that effect, 12 C.F.R. § 563b.7(d) (1994), and requires that each offering circular contain on its cover the following disclaimer in capital letters and bold-face type:
 
 
 40
 THESE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE OFFICE OF THRIFT SUPERVISION NOR HAS SUCH OFFICE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.
 
 
 41
 12 C.F.R. § 563b.102 Item 3 (1994). Because the agency expressly disclaims any intent to decide whether or not the disclosure contained in an offering circular is adequate or accurate, a district court is ordinarily free to decide those issues without fear of contravening 12 U.S.C. § 1464(i)(2)(B). Rembold, 798 F.2d at 1311 (district court has jurisdiction to hear allegations of securities fraud in connection with conversion offering circular); cf. Reschini, 46 F.3d at 253 (district court has subject matter jurisdiction to consider allegations of fraud in conversion proxy statement).
 
 
 42
 Of course, a challenge to the adequacy and accuracy of disclosure must consist of more than "bare bones allegations" of fraud. Craft, 786 F.2d at 1554. If the complaint does no more than allege that the conversion plan itself was deceptive or unfair, but identifies no inaccuracies or omissions of material fact in the disclosure materials, the complaint should be dismissed for lack of subject matter jurisdiction. Harr, 557 F.2d at 753-54.
 
 
 43
 With these general principles in mind, we turn to an analysis of the instant complaint.
 
 II Present Claims
 
 44
 We review the legal conclusions underlying a district court's dismissal for lack of subject matter jurisdiction de novo and its factual findings for clear error. Wake v. United States, 89 F.3d 53, 57 (2d Cir.1996).
 
 A. The Appraisals
 
 45
 Each of the plaintiffs' complaints alleges that the offering circular falsely represented that the initial appraisal was reliable and the updated appraisal would be higher than the initial appraisal only if market conditions so warranted. In fact, plaintiffs allege, the defendants knew or should have known that the initial appraisal was unreliable and false and that the offering size would be increased by 15 percent regardless of market conditions, if it was necessary to complete the offering. The plaintiffs thus attack both the initial and the updated appraisals.
 
 
 46
 In the trial court, defendants argued that entertaining the claims with regard to the initial and final appraisals would necessarily require that court to redetermine matters already fully considered and decided by the OTS in its approval of the conversion plan. Accordingly, defendants maintained the district court was without subject matter jurisdiction to hear the claims regarding the appraisals.
 
 
 47
 In its amicus brief, the OTS argues that the plaintiffs should be foreclosed from attacking the methodology of the initial appraisal, because the OTS carefully reviews the methodology of initial appraisals when making the decision to approve a conversion plan. The OTS would, however, have us permit the plaintiffs to attack the updated appraisal to the extent that the plaintiffs allege either that the financial data used to arrive at the updated appraisal were fraudulent or that the appraisal methodology approved by the OTS was not followed. The SEC, in opposition, argues in its amicus brief that the plaintiffs should be free to attack both the initial and updated appraisals without running afoul of the exclusive review provisions. In the SEC's view, because the OTS disclaims responsibility for accuracy of the ultimate price to investors, a suit challenging the appraisal that leads to such a price is not a challenge to the OTS conversion approval decision, and the exclusive review provisions are inapplicable.
 
 
 48
 Any analysis of the appraisal issue must start with the realization that OTS approval of a conversion application and the related offering circular does no more than authorize the savings association to convert and to offer its stock to investors. The decision regarding purchase of the bank's stock is, of course, solely up to potential investors. See Ordower, 999 F.2d at 1188 (noting similar considerations with respect to proxy statements). When seeking to persuade investors to buy its stock, the issuer is not relieved of the obligation to conduct the sale in an honest manner.
 
 
 49
 Recognizing that it is the responsibility of the investor, not the OTS, to decide whether the stock represents a good investment, the OTS expressly prohibits issuers from representing to investors that the OTS has approved the price of the shares. The OTS does not (and has no authority to) make binding determinations as to whether stock is fairly priced from the investor's point of view. Nor does the OTS pass upon the adequacy or accuracy of the information disclosed in the offering circular. We therefore agree with the SEC that an investor can allege fraud in a conversion appraisal without running afoul of the exclusive review provisions.
 
 
 50
 A different result would fail to protect investor interests. First, when it comes to evaluating the price at which the converted institution's stock will be sold, the OTS and investors have different objectives. In conducting its review of the appraisal methodology, the OTS's primary aim is to ensure that the converted institution's stock is not underpriced. Appraisal Guidelines, supra, at 1. Historically, most conversion stocks have experienced significant price gains in their initial days of trading. See Ira L. Tannenbaum, New OTS, FDIC Rules Alter Mutual-to-Stock Conversion Process, Banking Pol'y Rep., March 6, 1995, at 14-15 (noting an average first-week price gain of 27.7 percent for stocks of converted institutions) (citing Monthly Market Report (SNL Securities L.P.), May 1994, at 4). The OTS has sought to limit this trend by carefully reviewing the credentials of appraisers and scrutinizing the methodology used by such appraisers to value converted institutions. Id. By scrutinizing valuations to ensure that they are not unreasonably low, the OTS seeks to prevent investors (many of whom are insiders) from receiving a windfall at the expense of the institution and to ensure that the institution receives a large infusion of capital--thereby decreasing the risk that the institution will later become insolvent and require a payout from the federal deposit insurance fund. Appraisal Guidelines, supra, at 1.
 
 
 51
 Investors, in contrast, are generally happy, not distressed, when a savings institution gives them the chance to buy stock at a bargain price, lower than its true value. To the subscriber to a stock offering, the greater danger is that he or she will purchase stock at the offering price, and later--due to matters not disclosed in the offering circular--the stock price will drop. Overvaluing of the stock, rather than undervaluing, is the subscriber's primary concern.
 
 
 52
 As a practical matter, then, potential investors in the stock issued by a converted institution may be reluctant to rely on the OTS to protect their interests fully. See 2 Michael P. Malloy, Banking Law and Regulation § 5.3, at 5.46 (1995) (noting that banking regulators like the OTS focus their primary attention on the "safety and soundness of [depository] institutions rather than ... adequate disclosure to the investing public."). The primary mission of the OTS is the maintenance of "safe and sound operation ... of savings associations," 12 U.S.C. § 1463(a)(1), not investor protection. Recognizing that its review of the price at which the stock is sold may be inadequate to protect investors, the OTS prohibits issuers from representing to investors that the OTS has approved the price of the shares to be offered. § 563b.7(d) (1994).
 
 
 53
 Second, requiring an investor defrauded by misrepresentations or omissions relating to an appraisal to seek recourse exclusively under 12 U.S.C. § 1467a(j) would deprive the investor of a meaningful opportunity to pursue a valid securities fraud claim. To the extent the OTS makes any informal determinations regarding the adequacy of the appraisal, it does so in a non-judicial capacity without the benefit of an adversary hearing. Courts are generally reluctant to give preclusive weight to factual determinations made by administrative agencies under such circumstances. See United States v. Utah Constr. & Mining Co., 384 U.S. 394, 421-22, 86 S.Ct. 1545, 1559-60, 16 L.Ed.2d 642 (1966) (collateral estoppel effect is given to administrative findings only when agency acts in a judicial capacity and parties are given a meaningful opportunity to litigate). The OTS procedures for deciding the adequacy of an appraisal do not provide a meaningful substitute for the investor's right to a trial on the antifraud claims.
 
 
 54
 Finally, as the SEC notes in its amicus brief, it is doubtful that defrauded investors can discover the existence of fraud in an appraisal within the short time frame provided to seek judicial review of the conversion decision, particularly where, as here, the stock offering does not occur until after that 30-day period has expired. A 30-day period to discover the existence of fraud in an appraisal is in most cases unreasonable, and departs dramatically from the "1-and-3-year" statutes of limitations normally applicable to private securities actions. See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 354-55, 364, 111 S.Ct. 2773, 2777-78, 2782, 115 L.Ed.2d 321 (1991) (discussing statutes of limitations). Because, whenever possible, statutes should be interpreted to avoid unreasonable results, American Tobacco Co. v. Patterson, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538-39, 71 L.Ed.2d 748 (1982), we decline to ascribe to Congress an aim to shorten so drastically the statute of limitations in the absence of evidence in the legislative history suggesting such purpose.
 
 
 55
 Turning specifically to the two appraisals at issue here, the most difficult question we face is one raised in the OTS brief. The OTS argues that because it carefully reviews and passes upon the methodology contained in the initial appraisal before deciding to approve or disapprove a conversion plan, any attack on appraisal methodology must be brought in the court of appeals. Thus, they argue, the district court has no jurisdiction to consider the plaintiffs' attacks on either appraisal to the extent those claims allege that the methodology approved by the OTS for appraising Carver's stock was fraudulent. To successfully attack the initial or updated appraisals in the district court, the OTS argues, the plaintiffs must point to matters clearly not considered by the OTS--by alleging, for example, that Carver failed to use the methodology approved by the OTS or that the underlying financial data used to reach the updated appraisal using the approved methodology were fraudulent.
 
 
 56
 We agree, of course, that the exclusive review provisions pose no bar to claims that the defendants used fraudulent data or failed to use the OTS-approved conversion methodology. We disagree, however, with the suggestion that OTS review of the appraisal methodology when deciding whether to approve or disapprove a conversion automatically divests the district court of jurisdiction to consider whether the offering circular's disclosure with respect to that methodology was adequate for investors considering a stock purchase.
 
 
 57
 It may well be that before approving a plan of conversion, the OTS carefully considers the proposed appraisal methodology, probes its underlying assumptions, and takes steps to satisfy itself that the methodology will result in a fair stock price. And, although the OTS's primary focus is to ensure that the appraisal is not too low, we assume that the agency would also object to a methodology that it thought would result in a significant overvaluing of the stock. See Appraisal Guidelines, supra, at 1 (noting that although the OTS's main concern is underpricing of the stock, the OTS "also has a concern that the stock not be overpriced.").
 
 
 58
 But this does not end the matter. The issue decided by the OTS--whether an appraisal methodology is adequate for purposes of approving a conversion--is a different issue than that posed by the complaint--whether the offering circular adequately discloses potential weaknesses of that methodology to investors considering a stock purchase. The OTS does not decide the latter issue--indeed, it requires an express disclaimer, in bold-face type, of OTS responsibility for the adequacy or accuracy of disclosure. § 563b.102 Item 3 (1994).
 
 
 59
 Nor does OTS review of price information in connection with its conversion approval decision constitute approval of the price for purposes of investors. In its regulations, the OTS notes that, although it "will review the price information ... in determining whether to give approval to applications for conversion," banks are prohibited from making "representations [to investors] ... that such price information has been approved by the [OTS]." § 563b.7(d) (1994) (emphasis added).
 
 
 60
 That the OTS, when reviewing the price information (which includes the appraisal) in connection with its conversion approval decision, does not render a binding decision as to the adequacy of the price from the investor's viewpoint, should not be surprising. OTS approval of a plan of conversion authorizes the sale of stock--but it cannot require investors to buy. Investors, not the OTS, make the investment decision, and in making that decision, they are free to reach independent conclusions regarding the adequacy of the appraisal methodology. Even if the OTS, in approving the conversion, has determined that, in its view, the appraisal methodology is fair, it can no more require investors to accept its conclusions concerning the methodology than it can require them to purchase the stock to which the appraisal relates. Before making decisions concerning the adequacy of the stock price, investors are entitled to such fair and adequate disclosure concerning the appraisal methodology as the federal securities laws may require.
 
 
 61
 Because the OTS has made no binding determinations concerning the adequacy of the offering circular's disclosure concerning the appraisal methodology or the adequacy of the appraisal methodology from the investor's viewpoint, the matter can be addressed in the district court. We thus agree with the SEC that the plaintiffs can attack both the initial and updated appraisals without offending the exclusive review provisions.
 
 
 62
 We conclude therefore that the conversion statute's exclusive review provisions do not deprive the district court of subject matter jurisdiction to entertain the plaintiffs' claims regarding the initial and updated appraisals.
 
 B. The Appraiser's Independence
 
 63
 Each of the plaintiffs' complaints further alleges that the offering circular is defective in that it falsely represents that Capital Resources Group's appraisal of Carver was "wholly independent" when in fact, factors other than market conditions and economics influenced the appraisal. In particular, plaintiffs maintain that the offering circular is misleading because it does not disclose that the so-called independent appraiser is a direct affiliate of Capital Resources, the selling agent for the transaction.
 
 
 64
 The district court, relying on the fact that OTS regulations require an independent appraisal, concluded that the OTS, in approving the conversion, "expressly ... pass[ed] on the exact question raised by the complaint." 909 F.Supp. at 207. Because it considered that entertaining the claims relating to the independence of Capital Resources Group would require de novo review of the OTS's exercise of its authority in approving the appraiser, the district court concluded that 12 U.S.C. § 1464(i)(2)(B) deprived it of subject matter jurisdiction and dismissed the claims. Id. Again, we think the district court was too quick to conclude that the matters raised by the complaint were a collateral attack on matters decided by the OTS.
 
 
 65
 Because OTS approval does not require an investor to purchase the savings association's stock, the investor is free to make independent decisions as to matters relevant to the investment. Thus, the fact that the OTS, in approving the conversion, may have concluded that the appraiser was sufficiently independent does not mean an investor must reach the same conclusion. Investors are free to make their own determinations as to the independence of conversion appraisers and are entitled to the protections of the securities laws when doing so. The OTS does not make binding determinations with respect to the adequacy of the appraiser's independence from the investor's point of view or the adequacy of the offering circular's disclosure on such matters. Absent such determinations, resolving the issues raised by the plaintiffs' complaint with regard to the appraiser's independence requires no judicial review of an OTS decision, and the district court, which was free to decide the issue, erred in dismissing it.
 
 C. The Remaining Claims
 
 66
 Two sets of allegations remain. The first, contained in each complaint, alleges that the offering circular was misleading in that it failed to disclose in a meaningful way Carver's susceptibility to interest-rate fluctuations due to the percentage of mortgage-backed securities in its portfolio. The second, contained only in Gomberg's complaint, alleges that the offering circular falsely represented that subscriptions to purchase stock were irrevocable when in fact, certain select subscribers were permitted to revoke their purchase subscriptions.
 
 
 67
 The district court, in dismissing the complaints for lack of subject matter jurisdiction, failed to address either of these allegations. Dismissal of both claims was improper because neither claim raises issues decided by the OTS in the context of its approval of Carver's conversion. Both claims relate solely to the accuracy and adequacy of disclosure in the offering circular--a matter not decided by the OTS when making the conversion approval decision. Entertaining these claims thus requires no review of OTS action and 12 U.S.C. § 1464(i)(2)(B) does not deprive the district court of subject matter jurisdiction.
 
 CONCLUSION
 
 68
 Because we conclude that the district court had subject matter jurisdiction over the plaintiffs' complaint, we reverse and remand the case to it for further proceedings not inconsistent with this opinion. We have not determined and do not express any opinion on the merits of the allegations under Rule 12(b)(6) or Rule 56 since those issues must first be addressed by the district court.
 
 
 69
 Reversed and remanded.